## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **Christopher Gary Baylor,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| **KENNEDY COURT, LLC,** | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and, | ) | |
| | ) | |
| **DEPARTMENT OF HEALTH AND HUMAN** | ) | |
| **SERVICES, CENTERS FOR DISEASE** | ) | |
| **CONTROL AND PREVENTION,** | ) | |
| | ) | |
| Third Party Defendants. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### PRELIMINARY STATEMENT

1. As a matter of first impression and the first time in U.S. history, the Department of Health and Human Services and Centers for Disease Control and Prevention ("the Agencies") enacted a new and exclusive regulation that preempts a matter generally under State law, but through Congressional intent, is a power and authority vested by Congress pursuant to 42 U.S.C. 264(e), resulting in a "*Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*", 85 Fed. Reg. 55,292 (Sept. 4, 2020) ("the Order"). In line with the Agencies policy and practice of historically protecting human health and public safety, additionally requires State agencies and federal court to interpret and implement the protective Order in a manner as to achieve the following objective: "Mitigating the spread of COVID–19 within congregate or shared living settings, or through unsheltered homelessness". But the Agencies broad objective is undermined and narrowly limited to other factors.

On January 2021, Defendant, KENNEDY COURT, LLC, (hereinafter "KENNEDY") filed an action for eviction against African and Naive American male tenant Christopher Gary Baylor ("Baylor"), despite his execution and delivery of the Agencies declaration on December 7, 2020, declaring him a "covered person". Nonetheless KENNEDY commenced removal proceedings during the Order's Effective Period, and purports to base its reasoning on an ambiguous interpretation because the Order is written under the Plain Language Act 2010, which is not meant to provide an exhaustive list of reasons, but does allow for an unconstitutional reading. However this behavior and implicitly modified language violates the Fair Housing Act and Fifth Amendment of the U.S. Constitution when Agencies refuse to clarify language in its Order, and allows landlords, property owners and other person who rent residential property to refuse to contract to African American tenants who may have developed a history of late or non-payments due to the adverse affects of COVID-19, thus encourages lease terminations, refusals to contract, and infringement upon fair housing laws against African Americans, who as a people have historically been made disadvantaged. Additionally, the heavily enforced restrictions on commerce by the U.S. Government, including the Agencies, has caused a fair housing crisis, allowing renters to file evictions under terms not explicitly stated in the Order's preclusive list for violations only. Therefore by ignoring the issue has caused a split amongst State and federal courts, and the misinterpreted language derived from the Order allows for the deprivation of fundamentally protected rights that largely affect one protected group over another, is discriminatory and burdens the Fair Housing and Fifth Amendment rights of African Americans. It also violates the Equal Protection Clause.

## JURISDICTION AND VENUE

2.      Baylor brings this action pursuant to the Fair Housing Act of 1968 for violations of Civil Rights under the Fifth Amendment to the United States Constitution.

3.     The case presents federal questions within this Court's jurisdiction under Article III, § 2 of the United States Constitution and 28 U.S.C. §§ 1331 and 1343.

4.     The case is subject to diversity jurisdiction under 28 U.S.C. 1332. No party is a Citizen of the same State and the amount in controversy exceeds $75,000, exclusive of interests and costs.

5.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

6.     Venue is proper in this Court under 28 U.S.C. § 1391 because KENNEDY resides in this District, and a substantial part of the events occur under the Agencies Order giving rise to this claim which occurred in this District. Alternatively, See Fla. Stat. § 48.193(a)(1) and (3).

## PARTIES

7.     Plaintiff, Christopher Gary Baylor is an African and Native American male, a natural person domiciled in the county of Delaware, and is a Citizen of the State of Pennsylvania. He is a temporary resident of Brevard County, Florida.

8.     Defendant, KENNEDY is a Limited Liability Company organized under Florida law, and is incorporated under DHB DEVELOPMENT in the State of New York, and has its principal place of business in the State of New York, city of Rochester. KENNEDY has two owners (Joe D'Alessandro and Lisa D'Alessandro) both whom are individuals domiciled in the State of New York, and reside in the State of Florida, city of Kissimmee.

9.     Defendant, U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES is the United States, with a principal place of business in the State of Georgia, and has ten regional offices including the State of Florida, city of Tallahassee.

10.     Defendant, CENTERS FOR DISEASE CONTROL AND PREVENTION is the United States, with a principal place of business in the State of Georgia, and one of eleven operating divisions and eight agencies part of the Public Health Service and U.S. Department of Health & Human Services, including an office in the State of Florida, Tallahassee.

## STATEMENT OF FACTS

### Nature and State of Proceeding

11.     Since certain governors like Gov. Ron DeSantis allowed Florida's state eviction and foreclosure moratorium to expire at the end of September 2020, the Department of Health and Human Services, and Centers for Disease Control and Prevention created an Order freezing evictions, which is now the only policy preventing many Florida renters from being evicted.

12.     Baylor is an African and Native American male, military veteran and victim of reduced income and job loss due to the adverse economic effects of the U.S. Government's restrictions emplaced to reduce the spread of the Novel Coronavirus/COVID-19. As a result, Baylor sought housing assistance and was granted veteran's aid, where although provided, was made by untimely payments.

13.     KENNEDY is a Limited Liability Company, a wholly owned subsidiary of multi-million dollar company DHB DEVELOPMENT, A.K.A. D'ALESSANDRO HOUSR BUYERS, a New York Corporation that "*flip[s] and own[s] hous[es] for fun*!", owning real residential property at 1111 Kennedy Court, Titusville, Florida 32780 (the "Property").

14.     On or about November 2020, KENNEDY purchased the Property where Baylor resides.

15.     On November 2020, Baylor's veteran based rental assistance was eventually limited due to delays in federal funding, and Baylor's full monthly rental payments were reduced to partial payments. Accordingly, on December 2, 2020, Baylor executed the Agencies declaration and invoked moratorium protection under the federal Order, which was served upon KENNEDY the same day. But KENNEDY declined to accept Baylor's executed declaration several times before finally accepting it on or about December 10, 2020.

16.     On January 4, 2021, Baylor unexpectedly received a stimulus check, which he immediately converted into a rental payment for the month of January, deposited to the office of KENNEDY with an updated declaration. Both were returned to Baylor January 5, 2021.

17.    On January 8, 2021, KENNEDY commenced a State action for eviction in case 05-2021-CC-010813-XXXX-XX.

18.    According to the Agencies, "HHS/CDC has attempted to use plain language in promulgating rule[s] consistent with the Federal Plain Writing Act guidelines." 85 Fed. Reg. 7874 (Feb. 12, 2020).

19.    Under the plain language of the Agencies Order and upon execution of the declaration, Baylor met and continues to meet the criteria set forth under the five enumerated qualifiers for "Covered Persons". Under the plain language of the Agencies Order, Baylor has not violated any one or more of the five enumerated factors for precluding relief.

20.    KENNEDY's reason for ousting African American tenants during mass inflations in housing costs across the State of Florida; an economic crisis; a looming deadly pandemic, and; a federal mandate that puts a temporary stay on evictions, would nonetheless be implausible both factually and on its face. Property *flipping* could never serve as any legitimate interest when the reward could potentially result in the death or homelessness of minority residents, evicted.

### The Order

21.    Previously the federal government passed a limited eviction moratorium under the CARES Act which was predicated on a landlord's receipt of some benefit, direct or indirect, from the federal government.

22.    The new eviction moratorium has a broader application explicitly authorized by Congress[1] pursuant to 42 U.S.C. 264[2], where under this authority Agencies may clearly invoke

---

[1] The Congress is authorized "[t]o make all Laws which shall be necessary and proper for carrying into Execution". The authority bestowed on these entities is U.S. CONST., art. I, §8, cl. 18*See* CRS Report R43562, *Administrative Law Primer: Statutory Definitions of "Agency" and Characteristics of Agency Independence*, by Jared P. Cole and Daniel T. Shedd.

[2] "[Health and Human Services] is authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases. . . from one State or possession into any other State or possession. For purposes of carrying out and enforcing such regulations, the [Health and Human Services] may provide for such. . . measures, as in his judgment may be necessary." 42 USC § 201(c).

its power to declare a temporary moratorium on residential evictions (excluding foreclosures only) in the interest of protecting public health and safety. *See* 85 Fed. Reg. 55292 (Sept. 4, 2020)[3].

23.     In summary, the Agencies regulatory authority is unambiguously defined through federal statutes and the Order precisely identifies the Agencies "*Statement of Intent*" which provides in pertinent parts:

> "This Order shall be interpreted and implemented in a manner as to achieve the following objectives:
>
> • Mitigating the spread of COVID–19 within congregate or shared living settings, or through unsheltered homelessness;
>
> • mitigating the further spread of COVID–19 from one U.S. State or U.S. territory into any other U.S. State or U.S. territory. "

> See *Id*. at 55293, *Statement of Intent*, ¶1-2.

24.     In other words, the very purpose of the Agencies "*Order is a temporary eviction moratorium to prevent the further spread of COVID–19*" *Id*. at 55292, *Applicability*, ¶3;  and its ultimate objective is to prevent the residential removal of *covered persons*. See *Id*. at 55293, *Covered Person*.[4]

25.     The plain text in the Order makes it clear that "a landlord, owner of a residential property, or other person shall not '<u>evict</u>' any <u>covered person</u> from any residential property." *Id*. at 55296, *Findings and Action*, ¶3. The Order even goes so far as to implement civil and criminal penalties[5], and clearly defines "'Evict'" as "any action. . . to pursue eviction or a possessory

---

[3] *Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, 85 Fed. Reg. 55,292 (Sept. 4, 2020).

[4] " 'Covered person' means any tenant, lessee, or resident of a residential property who provides to their landlord, the owner of the residential property, or other person with a legal right to pursue eviction or a possessory action, a declaration under penalty of perjury".

[5] Under 18 U.S.C. 3559, 3571; 42 U.S.C. 271; and 42 CFR 70.18, a person violating this Order may be subject to a fine of no more than $100,000. . .

action, to remove or cause the removal of a covered person from a residential property." *Id*. at 55293, *Definitions*, ¶10.

26.     Thereby in plain language, any "eviction" action that occurs against any "covered person" during the moratorium's "Effective Period" is clearly prohibited. *Id* at ¶1. A rational interpretation of the Order's plain language bars eviction (of covered persons) for non-payment of rent, lease expiration/no cause, and any other cause for eviction under State law, but unrelated to obvious violations listed in the Order or generally under State law.

27.     This more rational reading is supported by the plain language in the Order since under the five enumerated categories which list when removal may occur under explicitly stated violations, is the only time a landlord, property owner or other person may preclude protection under the Order when a tenant or resident:

> (1) engages in criminal activity while on the premises;
>
> (2) threatens the health or safety of other residents;
>
> (3) damages or poses an immediate and significant risk of damage to property;
>
> (4) violates any applicable building code, health ordinance, or similar regulation relating to health and safety; or
>
> (5) violates any other contractual obligation[6], other than the timely payment of rent or similar housing-related payment (including non-payment or late payment of fees, penalties, or interest).
>
> *Applicability*, ¶4, 85 Fed. Reg. at 55294.

---

[6] It should be noted that a *covered person* does not violate any terms or conditions of his/her lease or rental agreement, or contractual obligation since the Order does not specify a period in which moratorium protection ceases to exist, especially after the intentional termination of a contract by a landlord that may or may not precede the execution of the declaration. The Order specifically states that "This declaration is for tenants, lessees, or residents of residential properties who are covered by the CDC's order temporarily halting residential evictions". . . "Each adult listed on the lease, rental agreement, or housing contract should complete this declaration. Unless the CDC order is extended, changed, or ended, the order prevents you from being evicted or removed from where you are living" *Attachment*, *Declaration Under Penalty of Perjury for the Centers for Disease Control and Prevention's Temporary Halt in Evictions to Prevent Further Spread of COVID–19*, ¶1, 85 Fed. Reg. at 55297.

28.     Naturally, the Order **ONLY** denies protection to persons not falling into one or more of the five categories stated above, but the list is for *violations* only. The plain language in the Order does not define nor preclude protection under any other section, nor does the Order preclude protection to tenants or residents whose landlord intentionally invites termination or expiration of a contract, lease or rental agreement.

29.     The text of the Order also supports this position since nowhere does it explicitly state that the included list of permissible grounds for eviction is exhaustive.

30.      But the Order does support the prohibition against evicting *covered persons*, which is "subject to the limitations in the 'Applicability'" sections, *Id*. at 55293, ¶1, where these limitations are repeated in five enumerated reasons for eviction *Id*. at 55294 ¶4. But nothing in the original Order appears to authorize eviction for any other reason than one or more of the five enumerated grounds.

31.     Additionally, no language in the Order suggests, states or purports that moratorium protection terminates upon the end of a contract, rental or lease agreement, but instead remains in effect unless "*extended, modified, or rescinded.*"[7]

32.     Furthermore, the Order does not explicitly state that an executed declaration form must be made before, during or after a terminated, expired or unexpired contract, rental or lease agreement, only that "each adult listed on the lease, rental agreement, or housing contract should likewise complete and provide a declaration" 85 Fed. Reg. 55292, 55297.

33.     "Any other obligation that the individual may have under a tenancy, lease, or similar contract" *Id*. at 55292, 55294, 55297, falls under the "Declaration form that tenants, lessees, or residents of residential properties **are covered** by the CDC's order" See. *Id*. at 55292, 55297. Plainly stated, the Order protects persons listed on a rental contract.

---

[7] "This Order is effective upon publication in the Federal Register and will remain in effect, unless extended, modified, or rescinded" *Effective Date*, 85 Fed. Reg. at 55297.

34.     More precisely, a "**resident**" who qualifies as a **covered person** is (any resident[8]. . . who provides to their landlord, the owner of the residential property, or other person. . . an [executed] declaration). No other language in the Order conveys any other meaning.

35.     In totality, the Order explicitly prohibits a landlord, owner of a residential property or other person from "evict[ing]" a *covered person* from residential rental property. See 85 Fed. Reg., 55296, *Findings and Action*, ¶3. Black's Law Dictionary defines 'Eviction' as the "act or <u>process</u> of legally dispossessing a person of land or rental property" 9th Ed. Pg. 635 (2009), whereby "any action by a landlord, owner of a residential property, or other person with a legal right to pursue eviction or a possessory action, to remove or cause the removal of a covered person from a residential property" <u>is prohibited</u>. *Id.* at 55293, *Definitions*, ¶9. Henceforth, under this plain meaning, the Agencies Order reaches all residents and tenants with or without an expired or terminated lease, and whose name appears on the contract, lease or rental agreement attached to the property, where all phases of the eviction process (including issuance of notice to vacate, detainer actions, hearings, or judgments for possession and writs) is prohibited.

36.     Congress vested Agencies with flexible power, including the preemptive authority to stay evictions that are traditionally matters of State law. Here, the Order is designed to protect public policy, health, safety and interests pursuant to federal law. Whereby "*this Order is a temporary eviction moratorium <u>to prevent the further spread of COVID–19</u>*", not a vehicle for landlords and attorneys to circumvent federal authority or for courts to violate the separation of powers clause, or the rights of the American people, especially African Americans. Any other interpretation is unconstitutional and infringes upon the authoritative power of the Agencies, including Congressional intent.

---

[8] "A person who lives in a particular place." *Black's Law Dictionary*, 9th Ed. Pg. 1424 (2009)(Resident defined).

**Landlords, Residential Property Owners and Other Persons Who Rent**

37.    KENNEDY is a Limited Liability Company owned by seasoned New York investors with allegedly over "*10 years of real-estate experience*", and whose policy explicitly states that "*finding, flipping & renting houses. . . with the DHB Development team is. . .* FUN!" Although property flipping may not be illegal *per se*[9] flipping certain property causes unwanted population shifts, forcing current residents to relocate, specifically indigent, elderly or people of a specific group or class. In this case, African Americans, which includes Baylor. Nonetheless, like many others who relocate from New York to Florida, KENNEDY exerts its New York style policies and practices without the benefit of helping poor residents in the State of Florida.

38.    One writer from the New York Post recently wrote:

> "[T]he Center for NYC Neighborhoods examined the consequences of unchecked house <u>flipping</u> in a city already reeling from an affordable-housing crisis. . . pressuring vulnerable families to forgo unrealized home equity and displacing residents of low-to moderate-income neighborhoods, including many communities of color. Since flipped homes usually have rental units, thousands of tenants are also being uprooted as rents soar <u>post-flip</u>."[10]

39.    "We desperately need LLC transparency" *Id*.

40.    In the State of Florida, in the city of Titusville, where small pockets of African Americans reside peacefully in scare but affordable housing, KENNEDY's common practice of property *flipping* in low income areas has a adisproportionately adverse effect on African Americans, especially when property flipping is practiced in communities of colored persons with already less than affordable housing, but for the purpose of replacing a minority class with a more affluent and wealthier White class, an act that has substantially injured and impacted Baylor who categorically falls within a class of indigent colored people.

---

[9] "*A Mortgage Minute for the Average Joe*" https://www.fbi.gov/video-repository/newss-property-flipping/view

[10] *House-flipping is destroying NYC neighborhoods*, Catherine Curan, New York Post, April 28, 2018 https://nypost.com/2018/04/28/house-flipping-is-destroying-nyc-neighborhoods/

41.     According to Caroline Nagy, the Director of Policy and Research at the Center for NYC Neighborhoods "*flippers target people at risk of losing their homes*"[11]

42.     Unsurprisingly, KENNEDY targeted a class of colored residents whose payments were either late, or had trouble making payments due to COVID-19, but instead of renovating the property to encourage more economic development; decided to oust its minority tenants through non-lease renewals in order to attract a wealthier class of people, most notably Whites who can afford to pay KENNEDY's 30% hike in rent during a national pandemic and economic crisis.

43.     Many seasoned investors like KENNEDY use the BRRRR strategy, which is essentially a mix of the fix-and-flip and buy-and-hold — but with a unique twist. BRRRR stands for "buy, rehabilitate, rent, refinance, and repeat." The investor (KENNEDY) buys a distressed or undervalued property, renovates it to quickly build equity, rents it out to establish a solid cash flow, and then does a cash-out refinance and uses that money to acquire another investment property. Experts call it "forced appreciation".

44.     KENNEDY's policy and practice of *property flipping* obviously incorporates the effects of displacement, segregation and gentrification, but is subtly cloaked by the willful termination or forced cancellation or non-renewal of tenant contracts, leases or rental agreements without any lawful or just cause, such as in Baylor's case.

45.     However no case, neither does the CDC Order support the argument that a new owner who entered into an unwritten lease[12] can allege violations of a contractual obligation, only tenant laws. The Order merely states that "a resident must provide a copy of th[e] declaration to [the] landlord. . . where [they] live". But unwritten agreements do not contain obligations other than rent payment, yet residents with expired or terminated leases fall within

---

[11] *NYC House Flipping Is On The Rise, Exacerbating Gentrification*, Lylla Younes, Gothamist Data, May 30, 2018, https://gothamist.com/news/nyc-house-flipping-is-on-the-rise-exacerbating-gentrification

[12] Any lease of lands and tenements, or either, made shall be deemed and held to be a tenancy at will unless it shall be in writing signed by the lessor. Fla. Stat.

the Order's protection.

46.     Nevertheless, KENNEDY's common policy and practice of property flipping in the face of the Agencies Order results in a detrimental and injurious decision to oust non-Whites and non-Caucasians[13][14] for pecuniary gain and discriminatory interests, at a time when the rate of death is higher amongst Blacks/African Americans[15]. There can be no policy or practice that overrides the basic fundamental protection of human, civil or housing rights when harmful to all human health and public interests regardless of race, color, creed, sex, national origin or financial status. Circumvention of the Agencies Order affects millions[16] of Americans[17][18][19][20]

47.     KENNEDY's underlying reason for evicting its tenants, especially African Americans like Baylor, is not only predicated on pecuniary interests through its practice of *property flipping*, but based on its desire to remove undesirable tenants like Baylor who are late and/or may at times provide non-payment because of COVID-19.

---

[13] *COVID-19 Hospitalization and Death by Race/Ethnicity*, CTRS. FOR DISEASE CONTROL & PREVENTION (Aug. 18, 2020),  http://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html

[14] *The Color of Coronavirus: COVID-19 Deaths by Race and Ethnicity in the U.S.*, APM RES. LAB (Sept. 16, 2020),  https://bit.ly/36K8ZPL (comparing white death rate of 47 per 100,000 with indigenous people death rate of 82 per 100,000).

[15] Gregorio A. Millett et al., *Assessing Differential Impacts of COVID-19 on Black Communities*, 47 ANNALS EPIDEMIOLOGY 37, 37 (July 2020), https://bit.ly/3iJ9BYv.

[16] See, e.g., Emily Benfer et al., "The COVID-19 Eviction Crisis: An Estimated 30-40 Million People in America Are at Risk," Aspen Institute (Aug. 7, 2020),     https://www.aspeninstitute.org/blog-posts/the-covid-19-eviction-crisis-an-estimated-30-40-million-people-in-america-are-at-risk/

[17] *Federal Moratorium Extended, but Eviction Filings Continue* (Feb. 9, 2021) https://evictionlab.org/moratorium-extended-evictions-continue/

[18] *Born Evicted: Eviction During Pregnancy Worsens Birth Outcomes and Child* (Mar. 1, 2021)*Wellbeing* https://evictionlab.org/born-evicted/

[19] *Racial and Gender Disparities among Evicted Americans,* Peter Hepburn, Renee Louis, Matthew Desmond Sociological Science December 16, 2020, 10.15195/v7.a27.

[20] See, e.g., Chris Arnold, "*Despite A New Federal Ban, Many Renters Are Still Getting Evicted*," NPR (Sept. 14, 2020), https://www.npr.org/2020/09/14/911939055/despite-a-new-federal-ban-many-renters-are-still-getting-evicted

48.     For example, in one case, "instead of evicting a tenant because of unpaid rent [one landlord] is removing renters because their leases were up and he decided not to renew them."[21] In another case, because a tenant is "unable to work and relying on disability benefits. . . [a]ttorneys for the landlord told [the tenant] that the CDC order didn't apply, since the landlords were simply declining to renew the couple's leases."[22] "In practice, landlords are filing "end-of-lease" evictions to try to get around the CDC order."[23]

49.     According to the Census Bureau, the population estimate for Titusville, Florida as of July 1, 2019, is 46,580, with 76.3% of the population said to be White, and 14.5% Black or African American.[24] But the most common racial or ethnic group living below the poverty line in Titusville, FL is White, followed by Black and Hispanic,

(1) White 5,046 ± 549

(2) Black 2,146 ± 420

50.     However, if the statistics are properly examined, while Whites may have a higher percentage of poverty compared to Blacks or African Americans, when viewed against the total population of either race, of the 35,540 Whites, 5,046 ± 549 accounts for only 15% of the White poverty level, while of the 6,754 Blacks, 2,146 ± 420 accounts for 32% of Blacks living in poverty. When factoring in other statistics such as the economic impact of COVID-19, Blacks are 90% less likely to afford KENNEDY's 30% rent increase, which automatically precludes

[21]*Loophole in eviction moratorium lets landlords evict tenants*, KMTV News 3 Omaha, Kent Luetzen, Mar 03, 2021    https://www.3newsnow.com/news/coronavirus/omaha-landlord-exploits-loophole-in-cdc-eviction-moratorium

[22]*Why Can't the Government Stop Evictions*?, Kriston Capps , Rachael Dottle , and Allison McCartney, Bloomberg, February 11, 2021

https://www.bloomberg.com/news/articles/2021-02-11/renters-are-falling-through-eviction-ban-loopholes

[23] *Gaping loopholes and vague state guidance leave some Pa. families out of a home despite federal ban on evictions*, Charlotte Keith, The Inquirer November 2, 2020
https://www.inquirer.com/news/pennsylvania/spl/pa-eviction-cdc-ban-loophole-renters-despair-20201102.html

[24] https://www.census.gov/quickfacts/fact/table/titusvillecityflorida#

most Blacks or African Americans from renting property owned by KENNEDY.

51.     Sadly, landlords, residential property owners and other persons who rent, including KENNEDY, are allowed to circumvent the Order based on *judge law*, which deprives African Americans of private interests, health and safety — such as Baylor, who is unable to afford higher rent, relocation costs or the ability to purchase real property. This has been historically the case throughout American history, but is now exacerbated by an infringement upon property, civil and housing rights when the federal mandate on a stay of eviction is undercut by landlords and the Agencies lack of clarification of the language in its own Order. Conduct which repeatedly devalues the lives and rights of African Americans.

52.     KENNEDY's multi-family property of 64 dwellings is currently at 9% capacity due to lease non-renewal, but stagnant by leases grandfathered through renewal prior to new ownership. Previous landlords offered Baylor renewal of his lease, but not KENNEDY.

### The Department of Health and Human Services and the Centers for Disease and Control Prevention Should Declare the Rights of the American People

53.     Highlighting the economic impact of the Novel Coronavirus/COVID-19, on September 4, 2020, to prevent the further spread of the deadly communicable disease, the Department of Health and Human Services and Centers for Disease Control and Prevention ("the Agencies") issued an Order under Section 361 of the Public Health Service Act to temporarily halt residential evictions. The Order was deemed effective immediately, but set to expire on December 31, 2020.

54.     During the Order's initial effective period "a Spotlight PA investigation found an inconsistent system of justice across 67 counties, leaving many vulnerable residents without the protections they were promised"[25].

---

[25]   "Rather than establish a clear and robust standard, the state court system has largely left it to district judges — who are not required to be lawyers or have gone to law school — to interpret the federal order, leading to starkly different outcomes from town to town and city to city; In practice, some landlords are filing "end-of-lease" evictions to try to get around the CDC order."

55.     Nonetheless, on December 27, 2020, under the Consolidated Appropriations Act 2021 ("CAA"), former President Trump signed into law an extension of the eviction moratorium Order until January 31, 2021. In tandem, the Agencies released an amended Order which was deemed effective January 31, 2021, but still written under the Plain Language Act, and merely expanded protections for territorial or tribal nations to include provisions for the American Samoa.

56.     But the Agencies Order did not provide greater clarification or protections for Americans who reside within the United States of America, the fifty States, and due to the ambiguity created by overly strict interpretations by some States, "eviction courts are conveyor belts" and "people are being evicted who should be protected under the order."[26] Various interpretations of the Order has lead to evictions across 3,006 counties and 14 boroughs in the United States, despite the existence of the Order.

57.     Nevertheless, on January 20, 2021, current President Biden signed an executive order mandating that the Centers for Disease Control and Prevention extend the current eviction moratorium until at least March 31, 2021. However, the language in the Order remains unchanged.


//


//


//

---

[26] Shamus Roller, Executive Director of the National Housing Law Project. https://www.npr.org/2021/02/12/966879082/renters-are-getting-evicted-despite-cdc-eviction-ban-im-scared

58.     On March 15, 2021, 2,272 organizations composed a letter to President Biden, yet again, but rightfully so, urged an extension of the Order:

---

March 15, 2021

President Joseph R. Biden
The White House
1600 Pennsylvania Avenue NW
Washington D.C. 20500

The Honorable Dr. Rochelle Walensky
Director
Centers for Disease Control and Prevention
Washington, D.C.

The Honorable Marcia Fudge
Secretary
U.S. Department of Housing and
Urban Development
Washington, D.C.

To President Biden, Director Walensky, and Secretary Fudge:

The undersigned 2,272 organizations write to urge you to take immediate action to prevent a catastrophic wave of evictions by issuing an Executive Order extending, improving, and enforcing, until the end of the pandemic, the federal eviction moratorium issued by the Centers for Disease Control and Prevention (CDC) and extended through March 31, 2021 through executive action. The eviction moratorium extends vital protections to renters at risk of eviction during the pandemic, and by doing so, it has helped keep stably housed millions of people who otherwise would have been evicted. The federal eviction moratorium does, however, have significant shortcomings that undermine its public health impact. We urge you to extend the eviction moratorium to keep renters stably housed during the pandemic, and to address the moratorium's shortcomings by improving and enforcing the order.

Evictions put lives at risk and strain our already overstretched public health systems. As the CDC makes clear in its order, "eviction moratoria—like quarantine, isolation, and social distancing—can be an effective public health measure utilized to prevent the spread of communicable disease." The CDC order rightfully holds that, "evictions threaten to increase the spread of COVID-19 as they force people to move, often into close quarters in new shared housing settings with friends or family, or congregate settings such as homeless shelters." The CDC warned that these challenges "may be exacerbated as fall and winter approach" and found that "immediate action is necessary." As outlined by the CDC, evictions have enormous consequences for individuals, their communities, and our nation's public health. In fact, evictions occurring between the beginning of the pandemic and the issuance of the CDC moratorium in September 2020 led to more than 400,000 more COVID-19 cases and nearly 11,000 additional deaths.

According to the Census Bureau, nearly one in five renters – disproportionately Black and Latino renters as compared to white renters – are behind on their rent. Experts estimate that these households already owe up to $57 billion in back rent. Extending the moratorium through the pandemic will provide the Biden administration and Congress time to enact a comprehensive relief package that includes robust housing and homelessness resources and for state and local governments to distribute these and other resources provided by Congress to households in need.

The Biden administration must also address shortcomings that prevent renters from making full use of the moratorium's protections. The Biden administration should issue an automatic and universal moratorium. Under the CDC moratorium, renters are only protected if they know about it and take affirmative steps to be protected. As a result, corporate and other landlords continue to evict renters before renters know about the moratorium protections or by finding reasons for eviction other than

---

59.     Without citing to more than 50,000 articles, opinions, researches or other data, it remains clear that the scope of the Agencies authority remains undermined since it was first invoked in response to COVID-19 as early as a January 30, 2020[27], *see* 85 Fed. Reg. 7874 (Feb. 12, 2020), where the Agencies may have first declared its statutory authority[28] to "allow for the enforce[ment] of a variety of public health regulations to prevent the spread of the communicable disease." Nonetheless the Agencies regulatory efforts and approaches (including economic, environmental, public health, safety effects; and equity) have largely been thwarted by the hands of courts — thus in doing so has rendered the Agencies authority and Order inadequate and ineffective.

60.     Moreover, at no time has any independent agency or organization, including the Agencies, and excluding the 2,272 agencies that signed a letter addressed to President Biden requesting generic relief, has legally fought on behalf of the American people in regards to the matter of the Order's misinterpreted language and its detrimental effects on the housing rights of Americans, especially African Americans such as Baylor. Whether or not intentional, the Agencies silence is implicit to the deprivation of fundamentally important rights that have been ignored by agencies, courts, Federal authorities and cooperating State and local authorities.

61.     Even though the very purpose of the Order is to mitigate the spread of COVID-19 and prevent homelessness, because the Agencies have refused or declined to address the misinterpreted language in its Order, where many have said is ambiguous or contains *loopholes*, contravenes Congressional intent and deprives millions of Americans of basic rights, including the constitutional rights of African American Baylor, rendering the Agencies authoritative power pursuant to federal law, unavailing. The United States Government created this economic crisis

---

[27] On January 30, 2019, the World Health Organization (WHO) declared the outbreak of the 2019-nCoV virus in China a Public Health Emergency of International Concern. 85 FR 7874.

[28] "Section 361(a), 42 U.S.C. 264(a), states that the Secretary may make and enforce regulations as necessary to prevent the introduction, transmission, and spread of "communicable diseases" from foreign countries into the United States or from one state or possession (U.S. territory) into any other state or possession (U.S. territory)." *Id*.

that contributes to the impact studies on residential property evictions, forced migrations, unwanted relocations, homelessness, death and discrimination across state lines. Nationally, 48 percent of all 4,930 hate crime victims reported to the FBI in 2019 were Black, making up the largest classification of victims.[29]

62.     Furthermore the Agencies actions or lack thereof, have a larger direct and adverse affect on the nation's housing for the African American population, which has historically remained a looming problem. Citing 109 studies, the Center for American Progress has said "There has been a long history of housing insecurity for people of color in the United States due to racially targeted policies and widespread discrimination, particularly within the rental housing market. These policies and practices continue to keep people of color in poverty."[30]

63.     Absent the Agencies clarification of the Plain language in its Order, or declaratory relief granted, many landlords, property owners and other persons who rent to residents or tenants will continue to develop subversive methods to oust minority tenants based on underlying discriminatory reasons, but cloaked as *non-payment* or *late payment*, which invites lease non-renewal, termination or the expiration of contracts and rental agreements exacted against minority groups, mainly African Americans such as in the case of Baylor.

## CAUSES OF ACTION

### VIOLATION OF THE FAIR HOUSING ACT OF 1968 - TITLE VIII OF THE CIVIL RIGHTS ACT 42 U.S.C. 3601

64.     Baylor restates and incorporates by reference the facts contained in the preceding paragraphs of this Complaint.

---

[29] *Hate crimes against Black residents rose at alarming rate in 2020*, Sabrina Schnur, Las Vegas Review-Journal, March 1, 2021 https://www.reviewjournal.com/crime/hate-crimes-against-black-residents-rose-at-alarming-rate-in-2020-2291468/

[30] *The Pandemic Has Exacerbated Housing Instability for Renters of Color*,  Jaboa Lake, Center for American Progress, October 30, 2020 https://www.americanprogress.org/issues/poverty/reports/2020/10/30/492606/pandemic-exacerbated-housing-instability-renters-color/

65.    In the following paragraphs, references to the Fair Housing Act include disparate impact as applied under Title VIII of the Civil Rights Act of 1968.

66.    Baylor is an African and Native American male who resides in a poor community of African Americans, and is a resident within property consisting of African Americans and other minorities including Hispanics ousted by their landlord for non-renewal of lease. Refusal to rent, or to refuse to negotiate for rental of, or otherwise make unavailable or deny, a dwelling, is a protected activity related to a matter of public concern. Baylor is therefore protected by the Fair Housing Act.

67.    Baylor's execution of the Agencies declaration for a moratorium from eviction during the Order's effective period, is an exclusive right contained in the terms, conditions, or privileges of renting a dwelling, and is protected under the Fair Housing Act.

68.    Baylor's previous landlords offered renewal of his lease rental agreement, but KENNEDY has purported that the dwelling is not available for rent to existing tenants, despite the property's 9% capacity and acceptance of at least four new White tenants. Baylor is therefore protected under the Fair Housing and Civil Rights Act.

69.    **Preponderance of the Evidence**: Irrational property flipping violates the Fair Housing Act, both on its face and as applied, because it imposes a decrease of affordable, accessible housing that meets the needs of Baylor, and makes unavailable dwellings in his own community, and especially in dominate White communities.

70.    **Policy Has a Disproportionately Adverse Effect:** Irrational property flipping violates the Fair Housing Act, both on its face and as applied, because it causes collateral consequences and bars Baylor from obtaining and maintaining secure housing in his own community. Forced relocation of indigents like Baylor without the financial means to move, and evictions made a matter of public record further nullifies basic rights already unprotected.

71.    **Practice is the Direct Cause of the Discriminatory Effect:** Irrational property flipping violates the Fair Housing Act, both on its face and as applied, because it unduly restricts

Baylor from taking advantage of expanded renter's protection even under special regulations promulgated by local, State or federal governments and agencies.

72.     **The Disparity Caused by the Practice is Significant:** Irrational property flipping violates the Fair Housing Act, both on its face and as applied, because Baylor was a victim of lost employment and reduced wages during this COVID-19 pandemic, which contributes to late or missed rental payments, but eviction is made disproportionately higher in times of economic crisis and by non-lease renewal, which poses a greater risk of death or homelessness for Baylor when the current housing stock does not fit his needs, especially with outlandish increases in rent, where so far, makes no viable housing options available without substantial financial capitol to relocate or purchase property.

73.     **There is a Direct Relation Between the Injury:** Irrational property flipping violates the Fair Housing Act, both on its face and as applied, because the threat of eviction engages in conduct that causes an exceedingly high financial burden against an indigent person unable to afford the cost of rent or legal representation, and increases anxiety and fear of losing a basic right unrecognized in White courts or a society traditionally against African Americans. Baylor is forced to suffer the impending loss of his only housing through commonly practiced discrimination that plagues African Americans since birth in the United States of America.

### VIOLATION OF FIFTH AMENDMENT RIGHTS - EQUAL PROTECTION CLAUSE - 28 U.S. Code § 1343

74.     Baylor restates and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

75.     The Agencies created a law that allows landlords to purposely circumvent the moratorium Order and violates the Equal Protection Clause of the Fifth Amendment, both on its face and as applied, because the Agencies knowingly and willingly conspire to deprive renters like Baylor, of the most basic fundamental rights or privileges made widely and more available to non-Whites and non-Caucasians, preventing him from exercising the same rights as Whites.

76.     The Agencies are given power to prevent or aid where further deprivation of Baylor's fundamental Housing or Fifth Amendment rights, is or about to occur, and is an authority that should be exercised to protect the rights of all U.S. citizens.

## REQUEST FOR RELIEF

WHEREFORE, Baylor respectfully requests that the Court enter judgment in his favor and against Defendants, and award the following relief:

A.     Declare that the current misinterpretation of the enumerated preclusions in the Applicability Section of the Moratorium Order, specifically (5) at 55294, violates the Fifth Amendment of the United States Constitution and Fair Housing Act, both on its face and as applied to Baylor;

B.     Preliminarily and permanently enjoin Defendants, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with it who receive actual notice of the injunction, requiring landlords, residential property owners and others who rent to certify that they are not currently engaged in the deprivation of Constitutional or Fair Housing Rights, and from penalizing Baylor based on their participation in property flipping or denial of enhanced rental protection under federal law, or the Moratorium Order;

C.     Alternatively, preliminarily and permanently enjoin Defendants, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with it who receive actual notice of the injunction, from requiring Baylor to vacate his only means of housing and from penalizing him based on his race, color or protected and verified status as a covered person under the Moratorium Order, Fair Housing Act or the Constitution;

D.     Award Baylor relocation costs in the amount of $257,990 and reasonable court fees against KENNEDY in this action;

E.      Award Baylor statutory damages against KENNEDY under 42 U.S. Code § 271;

F.      Grant Baylor such other relief or remedies to which he may be legally entitled, the opportunity to amend or modify his Complaint as necessary or appropriate, and after all appropriate parties have been served;

G.      Grant Baylor such other relief or remedies as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Baylor demands a trial by jury for all issues so triable.


Respectfully submitted,


*Against A Fatherless America*
Christopher Gary Baylor
Advocate for the Prevention of Child
Abduction, Abuse & Alienation
491 Baltimore Pike, Ste. 105
Springfield, Pennsylvania 19064
P: (484) 682-2605
cbaylor@aafa-law.org
edo_delight@comcast.net

Signed this 5th Day of April 2021

## <u>CERTIFICATION</u>

I, Christopher Gary Baylor declare that I am the Plaintiff in this case and have personal knowledge of information and belief of the facts stated in my Complaint;

I am not presenting this Complaint for some improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

I have not been deemed a serial, frivolous or malicious litigant in any State, and;

I have stated facts that are solely conclusive based on a clear defense which may be drawn from evidentiary support if necessary, or in the event of further discovery.

I certify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

<u>/s/Christopher Gary Baylor</u>
Christopher Gary Baylor

Signed this 5th Day of April 2021