UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


Christopher Gary Baylor,
        Plaintiff,

                                                    Case No.: 6:21-cv-00617-CEM-LRH

vs.

KENNEDY COURT, LLC, THE
DEPARTMENT OF HEALTH AND
HUMAN SERVICES, CENTERS FOR
DISEASE CONTROL AND PREVENTION,
        Defendants.
_____/


**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND**
**<u>PRELIMINARY INJUNCTION</u>**

Plaintiff Christopher Gary Baylor, a protected class citizen, hereby moves for an Emergency

Motion for Temporary Restraining Order and Preliminary Injunction, pursuant to Fed.R.Civ.P.

65(b), and moves this Court for issuance of a preliminary injunction pursuant to Fed.R.Civ.P 65(a),

after notice and hearing, prohibiting KENNEDY COURT, LLC from violating Title VIII of the Fair

Housing Act, in addition to enforcing eviction claims, and in support thereof, states as follows:

1.      This Motion is made pursuant to Sec. 813, 42 U.S.C. 3613(c)(1). This motion is

made to maintain the status quo until requisite notice may be given and opportunity afforded to

the opposing parties to respond to the application for a preliminary injunction.

2.      The issuance of a Temporary Restraining Order in this case is necessary because

the regulation and policy at issue became effective Wednesday, March 31, 2021, a copy attached

hereto as Exhibit "**A**", and is subject to immediate enforcement such that the fourteen (14) day

advance notice requirement for a preliminary injunction as required by Fed.R.Civ.P. 6(c), cannot

be had prior to enforcement. Thus, protection under the Fair Housing Act and the Agencies Temporary Halt on Residential Eviction Orders should be enforced before Baylor may be heard regarding this motion for a preliminary injunction.

3.      As of 10:00 a.m. Tuesday morning, May 11, 2021, the Titusville county court will authorize the Brevard County Sheriff's Department to enforce an eviction order against Baylor pursuant to Chapter 83 of the Landlord Tenant Laws.

4.      Baylor is threatened with irreparable injury which is so imminent that notice and a hearing on a Motion for Preliminary Injunction is impossible before hearing on motion.

5.      This Motion is filed on an emergency basis because the subject of the Agencies Moratorium Orders has an immediate adverse impact on Baylor's Fifth Amendment rights. Baylor has not been given an opportunity to file an Amended Complaint or responsive Motion, and this Emergency Motion would serve justice as soon as circumstances permit.

<u>**Conduct to be Enjoined**</u>

7.      Baylor seeks to enjoin the enforcement of the Temporary Halt in Residential Evictions Orders, 85 Fed. Reg. 55,292 (Sept. 4, 2020)(original) and 86 Fed. Reg. 16,731 (Mar. 31, 2021)(amended), in addition to Title VIII of the Fair Housing Act, 85 Fed. Reg. 60,288 (Sept. 24, 2020). These federal regulations are enforceable by civil penalties, injunction, and immediate cease and desist, including condemnation and threat of arrest of persons on the premises.

<u>**Notice to KENNEDY COURT, LLC**</u>

8.      A copy of this Emergency Motion will likewise be provided to KENNEDY COURT, LLC by first class certified mail contemporaneously with the filing of this Emergency Motion.

2

## Facts in Support of Injunctive Relief

**A. Enforcement of the Federal Agencies Temporary Halt on Residential Evictions Embodies Fifth Amendment Equal Protection Preventing Landlord Tenant Abuse**

7.      Verification of these essential facts and the need for emergency injunctive relief are set forth in the Verified Complaint (ECF.No.1).

8.      The Verified Complaint challenges the unconstitutional interpretation of the Agencies Order which ambiguously purports to ban Equal Protection for similarly situated persons who undoubtedly qualify as "covered persons", including Baylor, who as an individual:

(1) has used best efforts to obtain all available assistance for rent;

(2) earned no more than $99,000;

(3) is unable to pay the full rent;

(4) is using best efforts to make timely partial payments, and;

(5) eviction will render him homeless.

9.      Baylor is a resident of property owned by KENNEDY COURT, LLC (hereinafter "KENNEDY") that conducts business transactions in the City of Titusville, Florida, where it operates as landlord, owner of a residential property or other entity also known as DHB DEVELOPMENT or D'ALESSANDRO HOUSE BUYERS. At this residential property, it has engaged in acts or practices in trade or commerce, providing publicly to tenants, lessees or residents for periods of at least 30 days or 1 calendar month, a group of units, dwellings, buildings, or group of buildings within a single complex of buildings.

10.      Baylor is eligible for enhanced rental protection and a stay of eviction under the Agencies' Orders, since he provided an executed copy of the Agencies declaration to KENNEDY that is a landlord, owner of the residential property where Baylor lives, or other person who has a right to have him evicted or removed.

3

11.     Baylor is a "covered person" who qualifies for protection under the Agencies Order "despite" non-payment, when clause (2) under violations in the Applicability section provides one of three exceptions for individuals who signed a declaration submitted under a previous order, and where:

(1)     ~~Any evictions for nonpayment of rent initiated prior to September 4, 2020, but not yet completed, are subject to this Order;~~

(2)     Any tenant, lessee, or resident of a residential property who qualifies as a ''Covered Person'' and is still present in a rental unit is entitled to protections under this Order;

(3)     ~~Any eviction that was completed prior to September 4, 2020, is not subject to this Order~~.

12.     Baylor, who is still present in KENNEDY's rental unit, is eligible for protection under the Agencies' Orders and qualifies as a "covered person" who has not:

(1) Engaged in criminal activity while on the premises;

(2) Threatened the health or safety of other residents;

(3) Damaged or posed an immediate and significant risk of damage to property;

(4) Violated any applicable building code, health ordinance, or similar regulation relating to health and safety; or

(5) Violated any other contractual obligation, other than the timely payment of rent or similar housing-related payment (including non-payment or late payment of fees, penalties, or interest).

13.     The Department of Health and Human Services and Centers for Disease Control and Prevention and Federal Regulations 55292 and 16731 (the "Orders"), purports to regulate the further spread of COVID–19 by enforcing a temporary eviction moratorium. But the current

interpretation of the Orders is unconstitutional and directly allows eviction against "Covered Persons". The context of the Orders' plain language makes it clear, that in order:

> "to qualify for the protections of this Order, a tenant, lessee, or resident of a residential property must provide a completed and signed copy of a declaration with the elements listed in the definition of ''Covered person'' to their landlord, owner of the residential property where they live." 86 Fed. Reg. 16736, *Declaration Forms*.

The Orders consistently provide that:

> "any written document that an eligible tenant, lessee, or residents of residential property presents to their landlord will comply with this Order, as long as it contains the required elements of ''Covered person'' as described in this order." *Id*.

14.     Any other reading of the Orders is unconstitutional on its face and as applied to Baylor. Because the unconstitutional interpretations permitted by government, including court, are substantially overbroad, even declines to extend protection to qualified, eligible or covered persons. Baylor may raise Fifth Amendment claims in his own right and on behalf of the 30-40 million Americans whose rights are deprived by the overreaching application of *judge* law.

15.     As argued prior to the Agencies recent modification to its Order which now provides protection for *underlying* reasons, *See* Complaint ¶¶44-48 (ECF.No.1), despite non-payment:

> "covered persons may not be evicted on the sole basis that they are alleged to have committed the crime of trespass (or similar state-law offense) where the underlying activity is a covered person remaining in a residential property for nonpayment of rent." 86 Fed. Reg. 16736, *Applicability*.

16.     More precisely, the context of this modified Order now includes language that aligns with one exception which provides that:

> "[all] tenant[s], lessee[s], or resident[s] of a residential property who qualifies as a ''Covered Person'' and is still present in a rental unit is entitled to protections under this Order" *Id*.

17.     Therefore, the Agencies' Order now states that remaining on premises does not constitute "trespassing", which is equivalent to violation of a contractual obligation as a tenant, lessee or resident who holds over after term, or is tenancy at sufferance, etc. But this also includes unwritten leases tenancy at will.

18.     However, the current misinterpretation of the Orders, upheld by government, including court, and used by landlords and property owners to circumvent the moratorium on evictions, is read to preclude protection of residents who remain on residential property, which is overbroad, ambiguous and unconstitutional. The enumerated factors listed as preclusions for violations under the Applicability Section, specifically number 5, did not include "trespassing" as a violation of a contractual obligation, nor was it amended to suggest the same. Neither should it had or has been assumed that the Agencies intended to manifest an exhaustive list of imaginary preclusions, hidden from the public purview.

19.     The rather constitutional reading is supported by the context of the language in the Orders, whereby the enforcement by temporary restraining order and preliminary injunction would serve justice as soon as circumstances permit.

**B.  Enforcement of the Fair Housing Act May Prevent Disparate Impact and Protect The Fundamentally Important Civil Rights of African Americans**

20.     Baylor engages in protected activity on many different levels, all of which are infringed by the misinterpretation of the subject "Regulation" which contributes to the deprivation civil rights under the "Fair Housing Act", where:

(1)     Baylor met the minimum qualifications for renting property, which is a basic element to secure affordable, adequate, fair or equal housing, fully protected by the Fair Housing Act, but prohibited when the right to rent is infringed upon;

(2)     Baylor was rejected or passed over by KENNEDY's refusal to rent or to negotiate

for the rental of property, and in addition to knowing Baylor is a member of a protected class, increased rent to make housing unaffordable not only to Baylor, but the majority of African American tenants who already face limited to no affordable housing in their own community. The right to make and enforce contracts is fully protected under the FHA;

(3)     Baylor is a resident of KENNEDY's residential property which remains 85% vacant, but also unavailable to persons who are members of Baylor's protected class. Primary applicants and new tenants who intend to backfill the African American community, so far and as anticipated, are primarily White. Denial to equal housing is a discriminatory practice protected under the FHA;

(4)     Baylor's independent action is not frivolous, whereas the right to defend against an act preempted by federal law is one of the highest and most essential privileges, and as a member of a protected class or group, as contemplated by 42 U.S.C. § 1981 and 1982, which runs parallel to the protections provided by the FHA;

(5)     Baylor raises claims of selective mistreatment because similarly situated persons who are not members of Baylor's protected class are provided with housing without infringement or deprivation upon fundamentally important rights.

21.     KENNEDY's current policy of *property flipping for fun* is arbitrary, artificial and unnecessary in the face of displacing a disproportionate amount of African American residents in a low income community for the sole objective of forced appreciation of residential property.

22.     KENNEDY's pecuniary interests not only outweigh prohibited activity of evicting "covered persons" during the moratorium Order's effective period[1], but violates the Fair Housing

---

[1] "Subject to the limitations under ''Applicability'' a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action, shall not evict any covered person from any residential property in any jurisdiction to which this Order applies during the effective period of the Order."

Act because the effort used to oust its African American tenants through (1) refusal to rent; (2) refusal to contract; (3) increase in rent; (4) racial segregation; and (5) intentional failure to obey federal regulations, are discriminatory acts comparative to constructive eviction.

23.     KENNEDY is a wholly owned subsidiary of a multi-million dollar company that has operated in the same manner since at least May 2011, and will not be harmed by a temporary restraining order or injunction by a single resident. But to allow such unchecked behavior during the pendency of this suit will substantially harm Baylor, and deprive him of substantial rights.

24.     KENNEDY's motion, if granted, would far exceed any possible harm and injuries to Baylor if his motion is denied. Baylor's injuries are the loss of both civil and constitutional rights, and since no government official may deprive a person of a constitutional right, the Court is prevented from suppressing Baylor's rights pursuant to the Fifth Amendment.

25.     Baylor has a substantial likelihood of prevailing on the merits of his claims in that the current misinterpretation of the Orders is constitutionally defective in a number of different ways, and if left unchallenged, is a policy that aids in the discriminatory effect establishing disparate impact liability.

26.     The current unconstitutional reading of the Orders violate Baylor's right to Equal Protection on its face. And the current policy of *property flipping for fun* causes disparate impact to protected class or group of persons, primarily Blacks/African Americans.

27.     Unless this Court issues a TRO and then a preliminary injunction, Baylor will be irreparably injured by the deprivation of rights under the Fifth Amendment and Fair Housing Act. As a matter of law, deprivation of the Fifth Amendment right to Equal Protection is an irreparable injury for purposes of injunctive relief.

28.     Absent immediate relief, Baylor is unable and will not be able to utilize a broad range of presumptively enhanced housing rights promulgated under the Agencies' Orders.

29.     A preliminary injunction will preserve the status quo and allow Baylor to continue benefiting from advanced rental protection as contemplated by the Agencies, the Orders, the federal statute and Congressional intent, without incurring damages or the further deprivation of civil or constitutional rights.

30.     A preliminary injunction enjoining the constitutional enforcement of the Orders will serve the public interest of millions of Americans, including Floridians. The public has no lawful interest in the enforcement of unconstitutional regulations which violate the Fair Housing Act, the Fifth Amendment or other constitutional rights. Further, the public's Fifth Amendment rights are also infringed by the misinterpreted language in the regulation, as the public is denied access to enhanced rental and housing protections.

## Security

31.     The Court should exercise careful discretion and require Baylor to post no bond or a nominal bond, as the Defendants will incur no costs or damages if a preliminary injunction is entered. Specifically, KENNEDY will not sustain any cost or damage if the regulations are immediately enforced. The federal government, including the Biden administration, provides trillions of dollars worth of aid for landlords and residential property owners. KENNEDY, materially has the same access to immediate monetary relief and benefits as Baylor. No unnecessary costs or damages have yet to accrue to KENNEDY as a result of their operation.

32.     The only exposure of costs to KENNEDY is attorney fees pursuant to 42 U.S.C. §1988. The Defendants cannot recover attorney fees unless it shows Baylor's lawsuit is frivolous.

## MEMORANDUM OF LAW

### I.   PRELIMINARY INJUNCTION STANDARD

The Eleventh Circuit has established four prerequisites for a preliminary injunction . The movant must clearly show: (1) substantial likelihood of success on the merits; (2) substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to plaintiff outweighs the harm an injunction may cause defendant; and (4) that granting the injunction would not disserve the public interest. See <u>Church v. City of Huntsville</u>, 30 F.3d 1332, 1342 (11th Cir. 1994).

### II.   BAYLOR HAS STANDING; THIS MOTION IS RIPE; AND NO GROUNDS FOR ABSTENTION EXIST

Generally, injunctive relief claims in federal court, including temporary restraining orders, are barred by the federal Anti-Injunction Act. . . . unless they fall within one of three exceptions. The Eleventh Circuit has interpreted the Anti-Injunction Act as an absolute prohibition, unless (1) an injunction is "expressly authorized by an Act of Congress"; (2) the injunction is "necessary in aid of [the court's] jurisdiction"; or (3) the injunction is necessary "to protect or effectuate [the court's] judgments." See 28 U.S.C. § 2283.

Here, Baylor challenges regulation that infringes upon Fifth Amendment equal protection, and disparate impact claims under the Fair Housing Act. Exceptions for relief apply under both claims, as injunctive relief is expressly authorized under both laws:

First, the Agencies' Orders acknowledge the preemption clause under 42 U.S.C. 264(e), as authorized by Congress. Although absent explicitly expressive language, Congress' intent to supersede state law may be found from a scheme of federal regulation pervasive enough to make one reasonably infer that Congress left no room for the states to supplement it, therefore TRO and injunctive relief may be used to enjoin parties from enforcing acts contrary to federal regulations.

10

Lastly, the FHA provides, in pertinent part, that "if the court finds that a discriminatory housing practice has occurred or is about to occur," then the court may issue "any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)." § 3613(c)(1).

An injunction is necessary to protect or effectuate the court's judgment since an immediate and realistic danger of sustaining direct injury as a result of KENNEDY's utter reliance on the unconstitutional interpretation of the Agencies' Orders, directly threatens Baylor's civil and constitutional rights by completely subjecting him to adverse impact and outlawing his right to housing and equal protection given to similarly situated individuals who meet the Orders' minimum standard for protection as a "covered person".

Baylor's facially and as-applied constitutional challenge to the Orders provide no plausible reason for this Court to abstain from ruling in this case, or granting of a TRO or injunction. The issues present facially conclusive claims of federal preemption.

## III.  THE CURRENT MISINTERPRETATION OF THE AGENCIES' ORDERS IS UNCONSTITUTIONAL AND VIOLATES EQUAL PROTECTION

The current misreading of the Agencies' Orders is unconstitutional and violates Baylor's right to equal protection under the Fifth Amendment of the United States constitution, as similarly situated individuals are provided with enhanced rental protection. However, Baylor has been unreasonably classified and discriminated against based upon a misinterpretation of the Orders enumerated violations in the preclusion Section, specifically No.5 which fails to explicitly contain any language which precludes protection based on unspecified contractual obligations.

As KENNEDY noted, the parties merely entered into a rental agreement for the payment of rent on a month-to-month basis, creating a tenancy-at-will, whereas this type of contract does not contain any obligation other than the payment of rent.

Nonetheless, violation No. 5 in the preclusion section of the Orders does not specify that tenants, lessees or residents of this type should be precluded from relief. This misinterpretation is unconstitutional and violates the Equal Protection clause of the Fifth Amendment.

In *Gholston v. Housing Auth. of Montgomery*, the Court found that in promulgating a regulation, it is entirely consistent that agencies need not specifically deny to categories of otherwise eligible applicants, 818 F.2d 776, 782 (11th Cir. 1987). This finding is consistent with the fact the Equal Protection Clause of the Fourteenth Amendment has been held to apply to the federal government through the Due Process Clause located in the Fifth Amendment, whereas specific "exclusion of applicants allegedly violated HUD regulations" *Id.*

Therefore in promulgating the Orders, the Agencies did not create an exhaustive list to preclude every person for a magnitude of possible violations that may or may not include:

(1) Excessive Noise;
(2) Long Term Guests;
(3) Unauthorized Pets;
(4) Unauthorized Renovations and/or Decor;
(5) Unsanitary Conditions;
(6) Parking Violations, or;
(7) Other Illegal Activities such as smoking tobacco products indoors; use or display of illegal drugs; commercial use of property or unit; unsightly satellite dish installation; firearm possession, etc.

Otherwise, federal Agencies violate Equal Protection under the Fifth Amendment prohibiting federal government from discriminating against similarly situated individuals without a rational and neutral basis for doing so. But courts have taken a different approach by willingly creating ambiguity in the Order to preclude relief for eligible persons not specifically

precluded under the Orders plain language, thus unconstitutional.

Again, no language in the Orders support the conclusion that otherwise eligible or qualified persons not in violation of one or more of the five enumerated violations listed under preclusions, may be evicted based on any other reason not explicitly stated, especially under laws created by courts against tenants who continue living on residential property, once categorized as "trespassers".

But in the Agencies most recent modification to it Orders, "covered persons may not be evicted on the sole basis that they are alleged to have committed the crime of trespass (or similar state-law offense)". 86 Fed. Reg. 16736 (Applicability). Under this context, it should be axiomatic that all persons not in violation of the modified Order shall include "any tenant, lessee, or resident of a residential property who qualifies as a ''Covered Person'' and is still present in a rental unit is entitled to [the same] protections under this Order" *Id*, which includes tenants, lessees or residents with unwritten or expired lease, rental agreement or contractual obligations, tenancy-at-will or sufferance.

The courts unconstitutional interpretation of the Agencies Orders is unconstitutionally underinclusive because it singles out the very same persons for whom special prohibitions were created, but are not extended by equal protection, rather restricted by solely independent terms amplified by government, court and landlords, such as "covered person" and "non-payment, which are not interchangeable nor synonymous, yet made to intentionally single out Baylor and other similarly situated persons for selective enforcement, inequitable treatment, and purposeful discrimination through the unequal, unjust, and oppressive *judge* law created by court.

In particular, Baylor notes the following irrational and discriminatory exemptions for which the Orders are made functionally indistinguishable:

a.      The Orders similarly contain clauses that prohibit eviction of any "Covered Person", including tenants, lessees, or residents of a residential property who provides to their landlord, the owner of the residential property, or other person with a legal right to pursue eviction or a possessory action a declaration under penalty of perjury, indicating they meet certain qualifying elements. 86 Fed. Reg. 16731, *Definitions*.

b.      The Orders similarly contain clauses that preclude evictions based on a tenant, lessee, or resident: (1) Engaging in criminal activity; (2) threatening other residents; (3) damaging property; (4) violating any applicable building code, ordinance, or similar regulation; or (5) violating any other contractual obligation other than non-payment. 86 Fed. Reg. 16736, *Applicability*.

In the Agencies' recent modification to the Orders, rational and less discriminatory exceptions make the Orders more functionally distinguishable. In particular, Baylor notes the following exceptions to the irrational and discriminatory interpretations:

a.      The modified Order now states, "to qualify as a covered person eligible for the protections of this Order, a tenant, lessee, or resident of a residential property must provide a completed and signed copy of a declaration with the elements listed in the definition of ''Covered Person'' to their landlord, owner of the residential property where they live, or other person who has a right to have them evicted or removed." 86 Fed. Reg. 16736, *Declaration Forms*.

b.      The modified Order now states that "any tenant, lessee, or resident of a residential property who qualifies as a ''Covered Person'' and is still present in a rental unit is entitled to protections under this Order. *Id* at *Applicability*.

Based on the foregoing, it would be unconstitutional to deny equal protection to fully eligible or qualified persons based on some alleged contractual violation not specifically stated — or as listed herein on Page 12. Additionally, unwritten rental agreements do not contain contractual obligations other than an express agreement to pay rent on a month-to-month basis. Therefore "covered persons" who continue to reside in a rental unit and whose lease may or may not be expired, are likewise entitled to the same protections as persons subject to eviction for "non-payment". The United States Supreme Court has said "if there is only one reasonable construction of a regulation — then a court has no business deferring to any other reading" <u>Kisor v. Wilkie,__</u> U.S. __, 139 S. Ct. 2400, 2414 (2019).

Baylor's constitutional and civil right to the same enhanced rental protections liberally given to similarly situated persons, should be declared under the Fifth Amendment and Fair Housing Act. Otherwise the court's current interpretation of the Agencies' Order remains unconstitutional and violates Baylor's Civil and Constitutional Rights.

### Strict Scrutiny

Court should use strict scrutiny to demonstrate that it is using the least restrictive means to achieve a government interest, including the enforcement of the Agencies' Orders vital to the protection of public health and safety, because if a law treats individuals differently on the basis of another suspect classification, or if the law impinges on a fundamental right, it is subject to strict scrutiny. <u>Eide v. Sarasota County</u>, 908 F.2d 716, 722 (11th Cir. 1990). In the case of an as applied challenge, the remedy is an injunction preventing the unconstitutional application of the regulation to plaintiff's property and/or damages resulting from the unconstitutional application. *Id*.

## IV.   ABSENCE OF A TEMPORARY RESTRAINING ORDER OR INJUNCTIVE RELIEF FURTHER CAUSES DISPERATE IMPACT

The Fair Housing Act (FHA) creates a private right of action for an "aggrieved person" who is "injured by a discriminatory housing practice." 42 U.S.C. § 3602(i); 3613(a). Despite this, KENNEDY's discriminatory housing practice and policy is one which left houses once occupied by low-income African Americans, empty, where it currently maintains a vacancy rate at nearly 90%. Baylor, cited data that correlates predatory "*property flipping*" with forced displacement, segregation and gentrification of one minority class or group, which generally results in a disproportionately adverse impact on African Americans, including Baylor. Ousted for discriminatory reasons, vacancy's are slowly backfilled by wealthier White class, proving the causal chain presumed *post hoc ergo propter hoc* (after this, therefore because of this).

The historical backdrop in this case follows some direct relation to the injurious conduct by KENNDY, correctly explained by statistical data and related instances, that amongst its dramatic increase in rent during a global recession, the decisions and actions of KENNEDY are significant enough to be tantamount to constructive eviction when a rent increase may impose substantial financial hardships on such low-income family housing costs. Court noted similar findings in <u>Bloodworth v. Oxford Village Townhouses</u>, Inc., 377 F. Supp. 709 (N.D.Ga., 1974), where court found irreparable harm in a public housing rent increase of 50% as it would be tantamount to eviction. Similarly, KENNEDY's 30% increase in rent during our economic crisis due to the adverse affects of COVID-19, which causes loss of wages, income, jobs and homes, is equivalent to a 50% rent increase.

In *Bloodworth*, Court also accounted for "extraordinary situations" such as economic impact, noting that "if plaintiff were in a [less] favorable economic position, then the impact of

defendants' action would be great[er] and the court would find the injury to plaintiff to be irreparable." *Id*.[alteration of original]. Disparate impact liability may be found when the result displaces 98.4% of African American tenants from a single residential property through constructive eviction, which is discriminatory.

Under the circumstances, Baylor's injury is rooted in KENNEDY's ongoing behavior known to be the intervening cause and attributable to the violation of the Agencies anti-eviction Orders and disparate impact liability under the Fair Housing Act. KENNEDY's policy and conduct essentially prohibits housing that would normally be affordable to low-income working-class African Americans, including Baylor, but effectively made exclusive to most if not all people of color in a community faced with already limited affordable housing.

Additionally, KENNEDY would fail to show a valid reason for its policy of refusing, rejecting or declining to negotiate contracts with any remaining African American or minority tenants or residents, while dwelling renovations are 90% complete, and vacancy at 85%, no fair and effective alternative is exists except for injunctive relief and judgment on the merits.

Nonetheless, KENNEDY's practice and policy violates Section 3604(a) of the Fair Housing Act which makes it unlawful to "refuse to rent after the making of a bona fide offer, or to refuse to negotiate rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a)(emphasis added). Any retroactive effort to demonstrate belated compliance with the law would be counterintuitive, and merely amount to a temporary, rather than permanent solution.

Rendered homeless or forced to live in undesirable conditions is a special type of injury for preliminary injunction purposes, where justice would serve as soon as circumstances permit.

**V.   ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ENJOINING THE ENFORCEMENT OF THESE REGULATIONS AND FEDERAL LAWS IS IMPERATIVE IN THIS CASE.**

   **A.   Baylor is threatened with irreparable injury.**

   Baylor has taken the position that KENNEDY's activity falls within the purview of regulations promulgated under the Agencies, but the current misinterpretation of the Agencies Order on eviction moratorium prevents Baylor from engaging in constitutionally protected activity, including the invocation or exercise of civil rights under the Fair Housing Act. The purpose of one Order is to prevent evictions and homelessness, particularly to the most vulnerable households, 86 Fed. Reg. 16738. Especially where eviction would likely render [Baylor] homeless — because [he] has no other available housing options. *Id* at 16732.

   Such civil penalties and closure will maintain the status quo of guarding constitutionally protected rights and freedoms during the pendency of litigation, because even "possibly wrongful eviction from one's home is a serious injury. In the case of th[i]s plaintiff, other adequate housing is not available." Johnson v. U.S. Dept. of Agriculture, 734 F.2d 774 (11th Cir. 1984). However, a TRO and preliminary relief will prohibit businesses and individuals from engaging in unlawful business activity in accordance with applicable Federal law.

   **B.   The harm to Baylor if a preliminary injunction does not issue outweighs the harm to the KENNEDY if it is enjoined.**

   As a matter of law, the harm to Baylor is irreparable. Issuance of a preliminary injunction will not harm KENNEDY that will simply be precluded from enforcing eviction of a single tenant from residential property, whereby law is preempted by federal regulations promulgated by federal Agencies and authorized by Congress through statute, where under the Fifth Amendment should restrict federal government from declining to exercise Equal Protection guarantee imposed by the United States Constitution.

In applying the "balancing of harms" test, the Court should consider the likelihood of success on the merits. "[A] sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits." <u>Fla. Med. Ass'n v. U.S. Dept. of Health, Educ. and Welfare,</u> 601 F.2d 199, 201, n. 2 (5th Cir. 1979). Here, Baylor has a significant likelihood of success on the merits.

**C.  A preliminary injunction is not contrary to the public interest.**

An injunction preventing eviction under the Agencies Orders is patently preempted by federal law, thus serves the public interest which lies in the vindication of rights guaranteed under the Fifth Amendment and other constitutional rights.

Amongst 30-40 million Americans said to be impacted by COVID-19[2], many Floridians remain at risk for eviction due to wholly absent or expired state, local, territorial, or tribal moratorium on residential evictions[3]. Countless Americans, including African Native American Baylor, are subject to an unconstitutional misinterpretation of the Agencies Orders, therefore as a matter of public concern and fundamental interest, enforcing a constitutional mandate to prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits, would serve justice as soon as circumstances permit.

By its terms, the Fourteenth Amendment promises equal protection of state law. U.S. Const. amend. XIV, § 1. But when it comes to equal protection of federal law, the Fifth Amendment does that job. <u>Hampton v. Wong</u>, 426 U.S. 88, 100 (1976).

---

[2] See Emily Benfer, et al., The COVID–19 Eviction Crisis: An Estimated 30–40 Million People in America are at Risk, available at: https:// www.aspeninstitute.org/blog-posts/the-covid-19- eviction-crisis-an-estimated-30-40-million-peoplein-america-are-at-risk/.

[3] See Ron Hurtibise, Florida's ban on evictions has expired. What now for tenants who are months behind on rent?, available at https://www.sun-sentinel.com/business/fl-bz-desantis-allows-evictions-moratorium-to-expire-20200930-fppquozxejg2hgjemnopbqbauq-story.html

**WHEREFORE**, Baylor moves for entry of a Temporary Restraining Order and Preliminary Injunction enjoining KENNEDY and its agents and employees from enforcing any eviction or possessory action, including any removal action procured through constructive means causing disparate impact under the Fair Housing Act.

## <u>CERTIFICATION</u>

The undersigned hereby certifies, pursuant to Fed.R.Civ.P. 65(b)(1)(B), the efforts to give notice and the reasons why prior notice is not required as follows: Defendant KENNEDY COURT, LLC was previously aware of the challenge to 85 Fed. Reg. 55292 once their Complaint was moved to this Court January 21, 2021. The modified regulation went into effect on Wednesday, March 31, 2021 and the undersigned believes self enforcement began once discovered on Sunday, May 8, 2021. This independent Complaint was filed Wednesday, April 7, 2021. A copy of this Emergency Motion will be made available to KENNEDY as soon as it is filed and additionally will be served via first class mail by the undersigned at the time of filing to the United States Court Middle District Florida, Orlando.

*I certify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.*

Respectfully signed this 13th day
of March 2021.

*Against A Fatherless America*
Christopher Gary Baylor
Advocate for the Prevention of Child
Abduction, Abuse & Alienation
491 Baltimore Pike, Ste. 105
Springfield, Pennsylvania 19064
P: (484) 682-2605
cbaylor@aafa-law.org

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy hereof will be served via first class email to KENNEDY COURT, LLC, via Luis D. Carreja, 3490 North U.S. Highway 1 Cocoa, Florida 32926 upon receipt in this Court.

/s/Christopher Gary Baylor<br>
Christopher Gary Baylor

Signed this 13th Day of May 2021

collection that are required to obtain a benefit: Specifically, the request for designation as a wholesale or limited purpose bank, the strategic plan, and the recordkeeping and reporting requirements associated with data regarding consumer loans and lending performance, affiliate lending data, and data on lending by a consortium or a third party.

Most of the information collected under Regulation BB is not considered confidential. However, if a respondent elects to submit a strategic plan pursuant to 12 CFR 228.27, the respondent may submit additional information to the Board relating to the strategic plan on a confidential basis, so long as the goals in the plan are sufficiently specific to enable the public and the Board to judge the merits of the plan. The Board will determine whether the additional information is entitled to confidential treatment on a case-by-case basis.

To the extent a respondent submits information contained in or related to examination, operating, or condition reports prepared by, or on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions, the respondent may request confidential treatment pursuant to exemption 8 of the Freedom of Information Act (FOIA).[4] To the extent a respondent submits nonpublic commercial or financial information which is both customarily and actually treated as private by the respondent, the respondent may request confidential treatment pursuant to exemption 4 of the FOIA.[5]

*Current actions:* On December 11, 2020, the Board published an initial notice in the **Federal Register** (85 FR 80097) requesting public comment for 60 days on the extension, without revision, of the FR BB. The comment period for this notice expired on February 9, 2021. The Board did not receive any comments. The Board adopted the extension, without revision, of the FR BB as originally proposed.

Board of Governors of the Federal Reserve System, March 25, 2021.

**Michele Taylor Fennell,**

*Deputy Associate Secretary of the Board.*

[FR Doc. 2021–06549 Filed 3–30–21; 8:45 am]

**BILLING CODE 6210–01–P**

---

[4] 5 U.S.C. 552(b)(8).

[5] 5 U.S.C. 552(b)(4).

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention

### Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID–19

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Agency order.

---

**SUMMARY:** The Centers for Disease Control and Prevention (CDC), located within the Department of Health and Human Services (HHS) announces the extension of an Order under Section 361 of the Public Health Service Act to temporarily halt residential evictions to prevent the further spread of COVID–19.

**DATES:** This Order is effective April 1, 2021 through June 30, 2021.

**FOR FURTHER INFORMATION CONTACT:** Tiffany Brown, Acting Deputy Chief of Staff, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS H21–10, Atlanta, GA 30329. Phone: 404–639–7000. Email: *cdcregulations@ cdc.gov.*

**SUPPLEMENTARY INFORMATION:**

### Background

This Order further extends the original temporary eviction moratorium Order published on September 4, 2020, as initially extended by the Consolidated Appropriations Act, 2021, and further extended by the Order published on January 29, 2021 set to expire on March 31, 2021, with modifications through June 30, 2021. Because of COVID–19, household crowding and transmission, and the increased risk of individuals sheltering in close quarters in congregate settings such as homeless shelters, which may be unable to provide adequate social distancing as populations increase, extending the temporary halt on evictions, subject to further extension, modification, or rescission, is appropriate.

The Order is extended through June 30, 2021 based on current and projected epidemiological context of SARS-CoV–2 transmission throughout the United States. Although daily incidence of COVID–19 decreased and plateaued between January and March 25, 2021, widespread transmission continues at high levels, making the Order still necessary, especially given that previous plateaus have led to secondary and tertiary phases of acceleration.

A copy of the Order is provided below. A copy of the signed Order and

the Declaration can be found at: *https:// www.cdc.gov/coronavirus/2019-ncov/ covid-eviction-declaration.html.*

### Centers for Disease Control and Prevention Department of Health and Human Services

### Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations 70.2

### Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID–19

### Summary

Subject to the limitations under "Applicability," a landlord, owner of a residential property, or other person [1] with a legal right to pursue eviction or possessory action, shall not evict any covered person from any residential property in any jurisdiction to which this Order applies during the effective period of the Order.

### Definitions

"*Available government assistance*" means any governmental rental or housing payment benefits available to the individual or any household member.

"*Available housing*" means any available, unoccupied residential property, or other space for occupancy in any seasonal or temporary housing, that would not violate federal, state, or local occupancy standards and that would not result in an overall increase of housing cost to such individual.

"*Covered person*" [2] means any tenant, lessee, or resident of a residential property who provides to their landlord, the owner of the residential property, or other person with a legal right to pursue

---

[1] For purposes of this Order, "person" includes corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.

[2] This definition is based on factors that are known to contribute to evictions and thus increase the need for individuals to move into close quarters in new congregate or shared living arrangements or experience homelessness. Individuals who suffer job loss, have limited financial resources, are low income, or have high out-of-pocket medical expenses are more likely to be evicted for nonpayment of rent than others not experiencing these factors. See Desmond, M., Gershenson, C., Who gets evicted? Assessing individual, neighborhood, and network factors, *Soc Sci Res.* 2017;62:362–377. doi:10.1016/ j.ssresearch.2016.08.017, (identifying job loss as a possible predictor of eviction because renters who lose their jobs experience not only a sudden loss of income but also the loss of predictable future income). According to one survey, over one quarter (26%) of respondents also identified job loss as the primary cause of homelessness. See *2019 San Francisco Homeless Count & Survey Comprehensive Report,* Applied Survey Research, at 22, *https://hsh.sfgov.org/wp-content/uploads/ 2020/01/2019HIRDReport_SanFrancisco FinalDraft-1.pdf.* (last viewed Mar. 24, 2021).



EXHIBIT A

eviction or a possessory action,[3] a declaration under penalty of perjury indicating that:

(1) The individual has used best efforts to obtain all available government assistance for rent or housing;

(2) The individual either (i) earned no more than $99,000 (or $198,000 if filing jointly) in Calendar Year 2020, or expects to earn no more than $99,000 in annual income for Calendar Year 2021 (or no more than $198,000 if filing a joint tax return),[4] (ii) was not required to report any income in 2020 to the U.S. Internal Revenue Service, or (iii) received an Economic Impact Payment (stimulus check).[5][6]

(3) The individual is unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary[7] out-of-pocket medical expenses;

---

[3] As used throughout this Order, this would include, without limitation, an agent or attorney acting on behalf of the landlord or the owner of the residential property.

[4] According to one study, the national two-bedroom housing wage in 2020 was $23.96 per hour (approximately, $49,837 annually), meaning that an hourly wage of $23.96 was needed to afford a modest two-bedroom house without spending more than 30% of one's income on rent. The hourly wage needed in Hawaii (the highest cost U.S. State for rent) was $38.76 (approximately $80,621 annually). See *Out of Reach: How Much do you Need to Earn to Afford a Modest Apartment in Your State?*, National Low Income Housing Coalition, *https://reports.nlihc.org/oor* (last visited Mar. 23, 2021). As further explained herein, because this Order is intended to serve the critical public health goal of preventing evicted individuals from potentially contributing to the interstate spread of COVID–19 through movement into close quarters in new congregate, shared housing settings, or through homelessness, the higher income thresholds listed here have been determined to better serve this goal.

[5] "Stimulus check" includes payments made pursuant to Section 2201 of the CARES Act, to Section 9601 of the American Rescue Plan Act of 2021, or to any similar federally authorized payments made to individual natural persons in 2020 and 2021. Eligibility for the 2020 or 2021 stimulus checks has been based on an income that is equal to or lower than the income thresholds described above and does not change or expand who is a covered person under this Order since it was entered into on September 4, 2020.

[6] A person is likely to qualify for protection under this Order if they receive the following benefits: (a) Temporary Assistance for Needy Families (TANF); (b) Supplemental Nutrition Assistance Program (SNAP); (c) Supplemental Security Income (SSI); or (d) Supplemental Security Disability Income (SSDI) to the extent that income limits for these programs are less than or equal to the income limits for this Order. However, it is the individual's responsibility to verify that their income is within the income limits described.

[7] Extraordinary expenses are defined as those that prevented you from paying some or all of your rent or providing for other basic necessities like food security. To qualify as an extraordinary medical expense, the unreimbursed medical expense is on that is likely to exceed 7.5% of one's adjusted gross income for the year.

(4) The individual is using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses; and

(5) Eviction would likely render the individual homeless—or force the individual to move into and live in close quarters in a new congregate or shared living setting—because the individual has no other available housing options.

"*Evict*" and "*Eviction*" means any action by a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action, to remove or cause the removal of a covered person from a residential property. This definition also does not prohibit foreclosure on a home mortgage.

"*Residential property*" means any property leased for residential purposes, including any house, building, mobile home or land in a mobile home park,[8] or similar dwelling leased for residential purposes, but shall not include any hotel, motel, or other guest house rented to a temporary guest or seasonal tenant as defined under the laws of the state, territorial, tribal, or local jurisdiction.

"*State*" shall have the same definition as under 42 CFR 70.1, meaning "any of the 50 states, plus the District of Columbia."

"*U.S. territory*" shall have the same definition as under 42 CFR 70.1, meaning "any territory (also known as possessions) of the United States, including American Samoa, Guam, the Northern Mariana Islands, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands."

**Statement of Intent**

This Order shall be interpreted and implemented in a manner as to achieve the following objectives:

• Mitigating the spread of COVID–19 within crowded, congregate or shared living settings, or through unsheltered homelessness;

• Mitigating the further spread of COVID–19 from one state or territory into any other state or territory;

• Mitigating the further spread of COVID–19 by temporarily suspending the eviction of covered persons from residential property for nonpayment of rent; and

• Supporting response efforts to COVID–19 at the federal, state, local, territorial, and tribal levels.

---

[8] Mobile home parks may also be referred to as manufactured housing communities.

**Background**

There is currently a pandemic of a respiratory disease ("COVID–19") caused by a novel coronavirus (SARS–COV–2) that has now spread globally, including cases reported in all fifty states within the United States, plus the District of Columbia and U.S. territories. As of March 25, 2021, there have been almost 125 million cases of COVID–19 globally, resulting in over 2,700,000 deaths.[9] Over 29,700,000 cases have been identified in the United States, with new cases reported daily, and over 540,000 deaths due to the disease.[10] Although transmission has decreased since a peak in January 2021, the current number of cases per day remains almost twice as high as the initial peak in April 2020 and transmission rates are similar to the second peak in July 2020.

The virus that causes COVID–19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet), mainly through respiratory droplets produced when an infected person coughs, sneezes, or talks. Individuals without symptoms can also spread the virus.[11] Among adults, the risk for severe illness from COVID–19 increases with age, with older adults at highest risk. Severe illness means that persons with COVID–19 may require hospitalization, intensive care, or a ventilator to help them breathe, and may be fatal. People of any age with certain underlying medical conditions (*e.g.* cancer, obesity, serious heart conditions, or diabetes) are at increased risk for severe illness from COVID–19.[12]

COVID–19 presents a historic threat to public health, and COVID–19 cases have been detected in every county in the continental United States.[13] Between December 2020 and January 2021, the number of deaths per day from COVID–19 consistently exceeded any other

---

[9] *COVID–19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU),* Johns Hopkins Coronavirus Resource Center, *https://coronavirus.jhu.edu/map.html* (last visited Mar. 25, 2021).

[10] *COVID Data Tracker,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#datatracker-home* (last visited Mar. 25, 2021).

[11] Johansson MA, Quandelacy TM, Kada S, et al. SARS–CoV–2 Transmission From People Without COVID–19 Symptoms. JAMA Netw Open. 2021;4(1):e2035057. doi:10.1001/jamanetworkopen.2020.35057

[12] *People with Certain Medical Conditions,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html* (last visited Mar. 15, 2021).

[13] *US COVID–19 cases and deaths by state,* USAFacts, *https://usafacts.org/visualizations/coronavirus-covid-19-spread-map/* (last visited Mar. 24, 2021).

cause.[14] Although transmission levels have decreased since January, between February 25 and March 25, 2021, the daily incidence of COVID–19 remained comparable to the summer peak of transmission in July 2020, which is higher than the daily incidence when the Order initially took effect in September, 2020. Furthermore, 37% of counties in the United States are categorized as experiencing "high" transmission (over 100 cases per 100,000 people or greater than 10% test positivity) and an additional 30% of counties are categorized as experiencing "substantial" transmission (50–99.99 cases per 100,000 people or 8–9.99% test positivity).[15] No counties are currently considered free of spread, and only 8% of counties are considered to have low transmission.[16]

Two-dose mRNA COVID–19 vaccination became available in December 2020 and as of March 27, 2021 over 50 million people in the United States (more than 15% of the population) have been fully immunized.[17] In February 2021, a single dose COVID–19 vaccine also became available. CDC continues to update guidance for COVID–19 precautions among individuals who have been fully vaccinated; however, currently there are no recommended changes to COVID–19 prevention recommendations related to activities in public, such as avoiding crowded and poorly ventilated places. This is particularly important given continued transmission. Even as COVID–19 vaccines continue to be distributed, it remains critical to maintain COVID–19 precautions to avoid further rises in transmission and to guard against yet another increase in the rates of new infections. It is important to note that despite higher rates of vaccine coverage, the simultaneous roll-back of community mitigation efforts may continue to expose vulnerable populations, such as those targeted in this Order, to higher-than-average COVID–19 rates. It is important to note that despite higher rates of vaccine coverage, the simultaneous roll-back of community mitigation efforts may continue to expose vulnerable populations, such as

those targeted in this Order, to higher-than-average COVID–19 rates.[18]

In recent months, new variants of SARS–CoV–2 have also emerged globally.[19] Epidemiological evaluation of these variants shows increased transmissibility as well as possible increased mortality. The current substantial levels of transmission and the emergence of variants highlight the persistent and dynamic nature of the pandemic and the need for continued protections.

To respond to this public health threat, Federal, state, and local governments have taken unprecedented or exceedingly rare actions, including border closures, restrictions on travel, stay-at-home orders, mask requirements, and eviction moratoria. In particular, the COVID–19 pandemic has triggered unprecedented restrictions on interstate and foreign travel. For example, many states require travelers arriving from other states to obtain negative test results and/or quarantine upon arrival.[20] For international travel, all passengers age two or older—including U.S. citizens—must obtain a negative test result or show proof of recovery before they may board a flight to the United States.[21] Despite the need for travel precautions, airport use has increased in recent weeks, leading to heightened concerns of interstate transmission.[22] SARS–CoV–2 transmission, behavior change, and travel restrictions have devastated industries that depend on the movement of people, such as the travel, leisure, and hospitality.[23] Ten months after the initial wave of closures due to COVID–19, over 16 percent of the hospitality and leisure sector's labor force was

unemployed.[24] The persistent spread of COVID–19 continues to necessitate preventive action.

In the context of a pandemic, eviction moratoria—like quarantine, isolation, and social distancing—can be an effective public health measure utilized to prevent the spread of communicable disease. Eviction moratoria facilitate self-isolation by people who become ill or who are at risk for severe illness from COVID–19 due to an underlying medical condition. They also allow state and local authorities to more easily implement, as needed, stay-at-home and social distancing directives to mitigate the community spread of COVID–19.

Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act (Pub. L. 116–136) to aid individuals and businesses adversely affected by COVID–19 in March 2020. Section 4024 of the CARES Act provided a 120-day moratorium on eviction filings as well as other protections for tenants in certain rental properties with federal assistance or federally related financing. These protections helped alleviate the public health consequences of tenant displacement during the COVID–19 pandemic. The CARES Act eviction moratorium expired on July 24, 2020. The protections in the CARES Act supplemented temporary eviction moratoria and rent freezes implemented by governors and other local officials using emergency powers. Researchers estimated that this temporary federal moratorium provided relief to a material portion of the nation's roughly 43 million renters.[25] The CARES act also provided funding streams for emergency rental assistance; surveys estimate that this assistance became available to the public through rental assistance programs by July 2020.[26]

The federal moratorium provided by the CARES Act, however, did not reach all renters. Many renters who fell outside the scope of the Federal moratorium were instead protected under state and local moratoria. In August, it was estimated that as many as 30–40 million people in America could be at risk of eviction.[27] In early

[14] Woolf SH, Chapman DA, Lee JH. COVID–19 as the Leading Cause of Death in the United States. JAMA. 2021;325(2):123–124. doi:10.1001/jama.2020.24865.

[15] *COVID–19 Integrated County View*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#county-view (last visited Mar. 22, 2021).

[16] *Id.*

[17] *Id.*

[18] *COVID Data Tracker*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited Mar. 25, 2021).

[19] Abdool Karim SS, de Oliveira T. New SARS–CoV–2 Variants—Clinical, Public Health, and Vaccine Implications [published online ahead of print, 2021 Mar 24]. *N Engl J Med.* 2021;10.1056/NEJMc2100362. doi:10.1056/NEJMc2100362.

[20] *Travel During COVID–19*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html (last updated Feb. 16, 2021).

[21] *Id.*

[22] Cecelia Smith-Schoenwalder, *CDC Urges Americans to Avoid Travel as Airport Screenings Approach Pandemic Peak*, U.S. News, https://www.usnews.com/news/health-news/articles/2021-03-22/cdc-urges-americans-to-avoid-travel-as-airport-screenings-approach-pandemic-peak (last visited Mar. 26, 2021).

[23] Aaron Klein & Ember Smith, *Explaining the economic impact of COVID–19: Core industries and the Hispanic workforce*, Brookings Institute, https://www.brookings.edu/research/explaining-the-economic-impact-of-covid-19-core-industries-and-the-hispanic-workforce/ (last visited Mar. 23, 2021).

[24] *Labor Force Statistics from the Current Population Survey*, U.S. Bureau of Labor Statistics, https://www.bls.gov/web/empsit/cpseea31.htm (last updated Mar. 5, 2021).

[25] See *CARES Act Eviction Moratorium*, Congressional Research Service, https://crsreports.congress.gov/product/pdf/IN/IN11320 (last visited Mar. 23, 2021).

[26] Vincent Reina et al., *COVID–19 Emergency Rental Assistance: Analysis of a National Survey of Programs*, Research Brief, https://nlihc.org/sites/default/files/HIP_NLIHC_Furman_Brief_FINAL.pdf (last visited Mar. 26, 2021).

[27] See Emily Benfer et al., *The COVID–19 Eviction Crisis: An Estimated 30–40 Million People in*

Continued

March, 2021, the Census Household Pulse Survey estimated that over 4 million adults who are not current on rent perceive that they are at imminent risk of eviction.[28] A wave of evictions on that scale would be unprecedented in modern times.[29] A large portion of those who are evicted may move into close quarters in shared housing or, as discussed below, become homeless, thus becoming at higher risk of COVID–19.

On September 4, 2020, the CDC Director issued an Order temporarily halting evictions in the United States for the reasons described therein. That Order was set to expire on December 31, 2020, subject to further extension, modification, or rescission. Section 502 of Title V, Division N of the Consolidated Appropriations Act, 2021 extended the Order until January 31, 2021. With the extension of the Order, Congress also provided $25 billion for emergency rental assistance for the payment of rent and rental arrears. Congress later provided an additional $21.55 billion in emergency rental assistance when it passed the American Rescue Plan.

On January 29, 2021, following an assessment of the ongoing pandemic, the CDC Director renewed the Order until March 31, 2021. This Order further extends and modifies the prior Eviction Moratoria until June 30, 2021, for the reasons described herein, subject to revision based on the changing public health landscape. To the extent any provision of this Order conflicts with prior Orders, this Order is controlling.

Researchers estimate that, in 2020, Federal, state, and local eviction moratoria led to over one million fewer evictions than the previous year.[30] Additional research shows that, despite the CDC eviction moratorium leading to an estimated 50% decrease in eviction filings compared to the historical average, there have still been over 100,000 eviction filings since

September, suggesting high demand and likelihood of mass evictions.[31]

**Eviction and Risk of COVID–19 Transmission**

Evicted renters must move, which leads to multiple outcomes that increase the risk of COVID–19 spread. Specifically, many evicted renters move into close quarters in shared housing or other congregate settings. According to the Census Bureau American Housing Survey, 32% of renters reported that they would move in with friends or family members upon eviction, which would introduce new household members and potentially increase household crowding. Studies show that COVID–19 transmission occurs readily within households. The secondary attack rate in households has been estimated to be 17%, and household contacts are estimated to be 6 times more likely to become infected by an index case of COVID–19 than other close contacts. A study of pregnant women in New York City showed that women in large households (greater number of residents per household) were three times as likely to test positive for SARS–CoV–2 than those in smaller households, and those in neighborhoods with greater household crowding (≤1 resident per room) were twice as likely to test positive.

Throughout the United States, counties with the highest proportion of crowded households have experienced COVID–19 mortality rates 2.6 times those of counties with the lowest proportion of crowded households.

Shared housing is not limited to friends and family. It includes a broad range of settings, including transitional housing and domestic violence and abuse shelters. Special considerations exist for such housing because of the challenges of maintaining social distance. Residents often gather closely or use shared equipment, such as kitchen appliances, laundry facilities, stairwells, and elevators. Residents may have unique needs, such as disabilities, chronic health conditions, cognitive decline, or limited access to technology, and thus may find it more difficult to take actions to protect themselves from COVID–19. CDC recommends that shelters provide new residents with a clean mask, keep them isolated from others, screen for symptoms at entry, or arrange for medical evaluations as needed depending on symptoms. Accordingly, an influx of new residents at facilities that offer support services could potentially overwhelm staff and,

if recommendations are not followed, lead to exposures.

Preliminary modeling projections and observational data from COVID–19 incidence comparisons across states that implemented and lifted eviction moratoria indicate that evictions substantially contribute to COVID–19 transmission. In mathematical models where eviction led exclusively to sharing housing with friends or family, lifting eviction moratoria led to a 40% increased risk of contracting COVID–19 among people who were evicted and those with whom they shared housing after eviction (pre-peer review). Compared to a scenario where no evictions occurred, the models also predicted a 5–50% increased risk of infection, even for those who did not share housing, as a result of increased overall transmission. The authors estimated that anywhere from 1,000 to 100,000 excess cases per million population could be attributable to evictions depending on the eviction and infection rates.

An analysis of observational data from state-based eviction moratoria in the 43 states and the District of Columbia showed significant increases in COVID–19 incidence and mortality approximately 2–3 months after eviction moratoria were lifted (pre-peer review). Specifically, the authors compared the COVID–19 incidence and mortality rates in states that lifted their moratoria with the rates in states that maintained their moratoria. In these models, the authors controlled for time-varying indicators of each state's test count as well as major public-health interventions including lifting stay-at-home orders, school closures, and mask mandates. After adjusting for these other changes, they found that the incidence of COVID–19 in states that lifted their moratoria was 1.6 times that of states that did not at 10 weeks post-lifting (95% CI 1.0, 2.3), a ratio that grew to 2.1 at ≥16 weeks (CI 1.1, 3.9). Similarly, they found that mortality in states that lifted their moratoria was 1.6 times that of states that did not at 7 weeks post-lifting (CI 1.2, 2.3), a ratio that grew to 5.4 at ≥16 weeks (CI 3.1, 9.3). The authors estimated that, nationally, over 433,000 cases of COVID–19 and over 10,000 deaths could be attributed to lifting state moratoria.[32]

*America are at Risk,* Aspen Institute, *https://www.aspeninstitute.org/blog-posts/the-covid-19-eviction-crisis-an-estimated-30-40-million-people-in-america-are-at-risk/* (last visited Mar. 23, 2021).

[28] *Household Pulse Survey,* United States Census Bureau, *https://www.census.gov/data-tools/demo/hhp/#/?measures=EVR* (last visited Mar. 25, 2021).

[29] As a baseline, approximately 900,000 renters are evicted every year in the United States. Princeton University Eviction Lab. *National Estimates: Eviction in America,* The Eviction Lab: Princeton University, *https://evictionlab.org/national-estimates/* (last visited Mar. 24, 2021).

[30] Pete Hepburn & Renee Louis, *Preliminary Analysis: Six Months of the CDC Eviction Moratorium,* The Eviction Lab: Princeton University, *https://evictionlab.org/six-months-cdc/* (last visited Mar. 26, 2021).

[31] *Id.*

[32] Leifheit, Kathryn M. and Linton, Sabriya L. and Raifman, Julia and Schwartz, Gabriel and Benfer, Emily and Zimmerman, Frederick J and Pollack, Craig, Expiring Eviction Moratoriums and COVID-19 Incidence and Mortality (November 30, 2020). Available at SSRN: *https://ssrn.com/abstract=3739576* or *http://dx.doi.org/10.2139/ssrn.3739576.*

Although data are limited, available evidence suggests evictions lead to interstate spread of COVID–19 in two ways. First, an eviction may lead the evicted members of a household to move across state lines. Of the 35 million Americans who move each year, 15% move to a new state. Second, even if a particular eviction, standing alone, would not always result in interstate displacement, the mass evictions that would occur in the absence of this Order would inevitably increase the interstate spread of COVID–19. This Order cannot effectively mitigate interstate transmission of COVID–19 without covering intrastate evictions, as the level of spread of SARS-CoV–2 resulting from these evictions can lead to SARS-CoV–2 transmission across state borders. Moreover, intrastate spread facilitates interstate spread in the context of communicable disease spread, given the nature of infectious disease. In the aggregate, the mass-scale evictions that will likely occur in the absence of this Order will inevitably increase interstate spread of COVID–19.

## Eviction, Homelessness, and Risk of Severe Disease From COVID–19

Evicted individuals without access to support or other assistance options may become homeless, including older adults or those with underlying medical conditions, who are more at risk for severe illness from COVID–19 than the general population. In Seattle-King County, 5–15% of people experiencing homelessness between 2018 and 2020 cited eviction as the primary reason for becoming homeless. Additionally, some individuals and families who are evicted may originally stay with family or friends, but subsequently seek homeless services. Among people who entered shelters throughout the United States in 2017, 27% were staying with family or friends beforehand.

People experiencing homelessness are at high risk for COVID–19. It may be more difficult for these persons to consistently access the necessary resources to adhere to public health recommendations to prevent COVID–19. For instance, it may not be possible to avoid certain congregate settings such as homeless shelters, or easily access facilities to engage in handwashing with soap and water.

Extensive outbreaks of COVID–19 have been identified in homeless shelters. In Seattle, Washington, a network of three related homeless shelters experienced an outbreak that led to 43 cases among residents and staff members. In Boston, Massachusetts, universal COVID–19 testing at a single shelter revealed 147 cases, representing 36% of shelter residents. COVID–19 testing in a single shelter in San Francisco led to the identification of 101 cases (67% of those tested). Data from 557 universal diagnostic testing events at homeless shelters in 21 states show an average of 6% positivity among shelter clients. Data comparing the incidence or severity of COVID–19 among people experiencing homelessness directly to the general population are limited. However, during the 15-day period of the outbreak in Boston, MA, researchers estimated a cumulative incidence of 46.3 cases of COVID–19 per 1000 persons experiencing homelessness, as compared to 1.9 cases per 1000 among Massachusetts adults (pre-print).

CDC guidance recommends increasing physical distance between beds in homeless shelters. To adhere to this guidance, shelters have limited the number of people served throughout the United States. In many places, considerably fewer beds are available to individuals who become homeless. Shelters that do not adhere to the guidance, and operate at ordinary or increased occupancy, are at greater risk for the types of outbreaks described above. The challenge of mitigating disease transmission in homeless shelters has been compounded because some organizations have chosen to stop or limit volunteer access and participation.

In the context of the current pandemic, large increases in evictions resulting in homelessness could have at least two potential negative consequences. One is if homeless shelters increase occupancy in ways that increase the exposure risk to COVID–19. The other is if homeless shelters limit new admissions, leading to increases in unsheltered homelessness, which is associated with significantly heightened risk of mortality generally. Neither consequence is in the interest of the public health.

Additionally, research suggests that the population of persons who would be evicted and those experiencing homelessness may be at risk of severe disease from COVID–19. Five studies have shown an association between eviction and hypertension, which has been associated with more severe outcomes from COVID–19. Also, people experiencing homelessness often have underlying conditions that increase their risk of severe outcomes of COVID–19. Among patients with COVID–19, homelessness has been associated with increased likelihood of hospitalization.

In short, evictions threaten to increase the spread of COVID–19 as they force people to move, often into close quarters in new shared housing settings with friends or family, or congregate settings such as homeless shelters. The ability of these settings to adhere to best practices, such as social distancing and other infection control measures, decreases as populations increase.

## Modifications

In addition to extending the effective period of the prior orders, this Order makes several modifications. A description of each modification follows:

CDC added a statement in the "Statement of Intent" section consistent with the clarification of the "Evict" and "Eviction" definitions. The statement now specifically clarifies that one intended purpose of this Order is to mitigate the spread of COVID–19 by temporarily suspending the eviction of covered persons from residential property for nonpayment of rent.

CDC modified the "Applicability" section to add the following points:

A signed declaration submitted under a previous order remains valid notwithstanding the issuance of this extended and modified order, and covered persons do not need to submit a new declaration under this Order. Evictions for nonpayment of rent initiated prior to September 4, 2020, but not yet completed are subject to this Order, but those that were completed before September 4, 2020, are not subject to the Order. While the Order does not prohibit evictions for engaging in criminal activity while on the leased premises, covered persons may not be evicted on the sole basis that they are alleged to have committed the crime of trespass (or similar state-law offense) where the underlying activity is a covered person remaining in a residential property despite nonpayment of rent. Individuals who are confirmed to have, who have been exposed to, or who might have COVID–19 and take reasonable precautions to not spread the disease should not be evicted on grounds that they pose a health or safety threat to other residents.

Even if a particular eviction, standing alone, would not always result in interstate displacement, the mass evictions that would occur in the absence of this Order would inevitably increase the interstate spread of COVID–19. Moreover, increases in intrastate spread further facilitate interstate spread in the context of communicable disease spread.

The "Background," "Eviction and Risk of COVID–19 Infection" and "Eviction, Homelessness, and Risk of Severe Disease from COVID–19"

subsections have been revised to reflect updated epidemiological and other relevant information in support of this Order.

CDC added a new section titled "Declaration Forms" with the following points:

To qualify as a covered person eligible for the protections of this Order, a tenant, lessee, or resident of a residential property must provide a completed and signed copy of a declaration with the elements listed in the definition of "Covered Person" to their landlord, owner of the residential property where they live, or other person who has a right to have them evicted or removed.

Tenants, lessees, or residents of a residential property may use any written document in place of the Declaration Form if it includes the required information as in the Form, is signed, and includes a perjury statement.

Tenants, lessees, or residents of a residential property can use a form translated into other Languages.

In some circumstances, it may be appropriate for one member of the residence to provide an executed declaration on behalf of the other adult residents who are party to the lease, rental agreement, or housing contract.

CDC modified the "Findings and Action" section to, among other things, further explain that this Order is not a rule within the meaning of the Administrative Procedure Act and, to the extent a court finds that the Order qualifies as a rule, there is good cause to dispense with prior public notice and comment.

## Applicability

This Order does not apply in any state, local, territorial, or tribal area with a moratorium on residential evictions that provides the same or greater level of public-health protection than the requirements listed in this Order or to the extent its application is prohibited by federal court order. In accordance with 42 U.S.C. 264(e), this Order does not preclude state, local, territorial, and tribal authorities from imposing additional requirements that provide greater public-health protection and are more restrictive than the requirements in this Order.

This Order is a temporary eviction moratorium to prevent the further spread of COVID–19. This Order does not relieve any individual of any obligation to pay rent, make a housing payment, or comply with any other obligation that the individual may have under a tenancy, lease, or similar contract. Nothing in this Order

precludes the charging or collecting of fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis, under the terms of any applicable contract. Nothing in this Order precludes evictions based on a tenant, lessee, or resident: (1) Engaging in criminal activity while on the premises; (2) threatening the health or safety of other residents; [33] (3) damaging or posing an immediate and significant risk of damage to property; (4) violating any applicable building code, health ordinance, or similar regulation relating to health and safety; or (5) violating any other contractual obligation, other than the timely payment of rent or similar housing-related payment (including non-payment or late payment of fees, penalties, or interest).

A signed declaration submitted under a previous order remains valid notwithstanding the issuance of this extended and modified order, and covered persons do not need to submit a new declaration under this Order.

Any evictions for nonpayment of rent initiated prior to September 4, 2020, but not yet completed, are subject to this Order. Any tenant, lessee, or resident of a residential property who qualifies as a "Covered Person" and is still present in a rental unit is entitled to protections under this Order. Any eviction that was completed prior to September 4, 2020, is not subject to this Order.

Under this Order, covered persons may be evicted for engaging in criminal activity while on the premises. But covered persons may not be evicted on the sole basis that they are alleged to have committed the crime of trespass (or similar state-law offense) where the underlying activity is a covered person remaining in a residential property for nonpayment of rent. Permitting such evictions would result in substantially more evictions overall, thus increasing the risk of disease transmission as otherwise covered persons move into congregate settings or experience homelessness. This result would be contrary to the stated objectives of this Order, and therefore would diminish their effectiveness. Moreover, to the extent such criminal trespass laws are invoked to establish criminal activity solely based on a tenant, lessee, or

resident of a residential property remaining in a residential property despite the nonpayment of rent, such invocation conflicts with this Order and is preempted pursuant to 42 U.S.C. 264(e).

Individuals who are confirmed to have, who have been exposed to, or who might have COVID–19 and take reasonable precautions to not spread the disease may not be evicted on grounds that they may pose a health or safety threat to other residents.

The Order is extended through June 30, 2021, based on the current and projected epidemiological context of SARS-CoV–2 transmission throughout the United States. Although daily incidence of COVID–19 decreased and plateaued between January and March 25, 2021, widespread transmission continues at high levels, making the Order still necessary, especially given that previous plateaus have led to secondary and tertiary phases of acceleration. Furthermore, the number of deaths per day continues at levels comparable to or higher than when this Order was established in September 2020.[34] This 90-day extension will allow the assessment of natural changes to COVID–19 incidence, the influences of new variants, and the expansion of COVID–19 vaccine coverage to determine if there is a continued need for a national eviction moratorium.

## Declaration Forms

To qualify for the protections of this Order, a tenant, lessee, or resident of a residential property must provide a completed and signed copy of a declaration with the elements listed in the definition of "Covered person" to their landlord, owner of the residential property where they live, or other person who has a right to have them evicted or removed from where they live. To assist tenants and landlords, the CDC created a standardized declaration form that can be downloaded here: *https://www.cdc.gov/coronavirus/2019-ncov/downloads/declaration-form.pdf.*

Tenants, lessees, and residents of residential property are not obligated to use the CDC form. Any written document that an eligible tenant, lessee, or residents of residential property presents to their landlord will comply with this Order, as long as it contains the required elements of "Covered person" as described in this order. In addition, tenants, lessees, and residents

---

[33] Individuals who might have COVID–19 are advised to stay home except to get medical care. Accordingly, individuals who might have COVID–19 and take reasonable precautions to not spread the disease should not be evicted on the ground that they may pose a health or safety threat to other residents. See *What to Do if You are Sick,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html* (last updated Mar. 17, 2021).

[34] *Trends in Number of COVID–19 Cases and Deaths in the US Reported to CDC, by State/Territory,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendsdeaths* (last visited Mar. 22, 2021).

of residential property are allowed to declare in writing that they meet the elements of covered person in other languages.

All declarations, regardless of form used, must be signed, and must include a statement that the tenant, lessee, or resident of a residential property understands that they could be liable for perjury for any false or misleading statements or omissions in the declaration. This Order does not preclude a landlord challenging the truthfulness of a tenant's, lessee's, or resident's declaration in court, as permitted under state or local law.

In certain circumstances, such as individuals filing a joint tax return, it may be appropriate for one member of the residence to provide an executed declaration on behalf of the other adult residents party to the lease, rental agreement, or housing contract. The declaration may be signed and transmitted either electronically or by hard copy.

**Findings and Action**

For the reasons described herein, I am extending and modifying the September 4, 2020 Order, as extended by section 502 of Title V, Division N of the Consolidated Appropriations Act, 2021 and further extended by the January 29, 2021 Order. I have determined that extending the temporary halt in evictions in this Order constitutes a reasonably necessary measure under 42 CFR 70.2 to prevent the further spread of COVID–19 throughout the United States. I have further determined that measures by states, localities, or territories that do not meet or exceed these minimum protections are insufficient to prevent the interstate spread of COVID–19.[35]

Based on the convergence of COVID–19, household crowding and transmission, and the increased risk of individuals sheltering in close quarters in congregate settings such as homeless shelters, which may be unable to provide adequate social distancing as populations increase, I have determined that extending the temporary halt on evictions is appropriate.

Therefore, under 42 CFR 70.2, subject to the limitations under the "Applicability" section, the September

4, 2020 Order is hereby modified and extended through June 30, 2021.

Accordingly, a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action shall not evict any covered person from any residential property in any state or U.S. territory in which there are documented cases of COVID–19 that provides a level of public-health protections below the requirements listed in this Order.

This Order is not a rule within the meaning of the Administrative Procedure Act (APA) but rather an emergency action taken under the existing authority of 42 CFR 70.2. The purpose of section 70.2, which was promulgated through notice-and-comment rulemaking, is to enable CDC to take swift steps to prevent contagion without having to seek a second round of public comments and without a delay in effective date.[36]

In the event that this Order qualifies as a rule under the APA, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and comment and the opportunity to comment on this Order and the delay in effective date. See 5 U.S.C. 553(b)(3)(B). Considering the public health emergency caused by COVID–19, it would be impracticable and contrary to the public health, and by extension the public interest, to delay the issuance and effective date of this Order.

In the September 4, 2020 Order, the previous CDC Director determined that good cause existed because the public health emergency caused by COVID–19 made it impracticable and contrary to the public health, and by extension the public interest, to delay the issuance and effective date of the Order. The previous Director also found that a delay in the effective date of the Order would permit the occurrence of evictions—potentially on a mass scale—that would have potentially significant consequences. For these reasons, the previous Director concluded that the delay in the effective date of the Order would defeat the purpose of the Order and endanger the public health and, therefore, determined that immediate action was necessary. As a result, the previous Director issued the Order without prior notice and comment and without a delay in the effective date. I made similar findings in the January 29, 2021 Order.

As noted above, although transmission levels have decreased

since January, between February 25, 2021 and March 25, 2021, the daily incidence of COVID–19 remained comparable to the summer peak of transmission in July 2020. Daily incidence in the last 30 days has remained consistently higher than the daily incidence when the Order took effect in September 2020. Furthermore, 37% of counties in the United States are categorized as experiencing "high" transmission (over 100 cases per 100,000 people or greater than 10% test positivity) and an additional 30% of counties are categorized as experiencing "substantial" transmission (50–99.99 cases per 100,000 people or 8–9.99% test positivity). No counties are currently considered free of spread, and only 8% of counties are considered to have low transmission. Because of these reasons and because the current extension is set to expire on March 31, 2021, I hereby conclude that immediate action is again necessary without prior notice and comment and without a delay in the effective date.

The rapidly changing nature of the pandemic requires not only that CDC act swiftly, but also deftly to ensure that its actions are commensurate with the threat. This necessarily involves assessing evolving conditions that inform CDC's determinations.

Although the pandemic is dynamic and the situation evolves over time, the fundamental public health threat that existed on September 4, 2020, and January 29, 2021—the risk of large numbers of residential evictions contributing to the spread of COVID–19 throughout the United States—continues to exist. Without this Order, there is every reason to expect that evictions will increase. It is imperative that public health authorities act quickly to help ward off an unprecedented wave of evictions, which would threaten new spikes in SARS-CoV–2 transmission at a critical juncture in fight against COVID–19. Such mass evictions and the attendant public-health consequences would be very difficult, if not impossible, to reverse. It would be impracticable and contrary to the public interest to delay the issuance and effective date of the Order pending notice-and-comment rulemaking for the reasons described herein, and because of the ever-changing landscape of the pandemic and the uncertainty of whether Congress would grant another extension as it did in December 2020.

Similarly, if this Order qualifies as a rule under the APA, the Office of Information and Regulatory Affairs (OIRA) has determined that it would be an economically significant regulatory

---

[35] In the United States, public health measures are implemented at all levels of government, including the federal, state, local, and tribal levels. Publicly-available compilations of pending measures indicate that eviction moratoria and other protections from eviction have expired or are set to expire in many jurisdictions. *COVID–19 Housing Policy Scorecard*, The Eviction Lab: Princeton University, *https://evictionlab.org/covid-policy-scorecard/* (last visited Mar. 23, 2021).

[36] *Chambless Enters., LLC v. Redfield*, No. 20–1455, 2020 WL 7588849, (W.D. La. 2020).

action pursuant to Executive Order 12866 and a major rule under the Congressional Review Act (CRA). But there would not be a delay in its effective date. CDC has determined that for the same reasons, there would be good cause under the CRA to make the requirements herein effective immediately. Thus, this action has been reviewed by OIRA.

If any provision of this Order, or the application of any provision to any persons, entities, or circumstances, shall be held invalid, the remainder of the provisions, or the application of such provisions to any persons, entities, or circumstances other than those to which it is held invalid, shall remain valid and in effect.

This Order shall be enforced by federal authorities and cooperating state and local authorities through the provisions of 18 U.S.C. 3559, 3571; 42 U.S.C. 243, 268, 271; and 42 CFR 70.18. However, this Order has no effect on the contractual obligations of renters to pay rent and shall not preclude charging or collecting fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis, under the terms of any applicable contract.

## Criminal Penalties

Under 18 U.S.C. 3559, 3571; 42 U.S.C. 271; and 42 CFR 70.18, a person violating this Order may be subject to a fine of no more than $100,000 or one year in jail, or both, if the violation does not result in a death, or a fine of no more than $250,000 or one year in jail, or both if the violation results in a death, or as otherwise provided by law. An organization violating this Order may be subject to a fine of no more than $200,000 per event if the violation does not result in a death or $500,000 per event if the violation results in a death or as otherwise provided by law. The U.S. Department of Justice may initiate criminal proceedings as appropriate seeking imposition of these criminal penalties.

## Notice to Cooperating State and Local Officials

Under 42 U.S.C. 243, the U.S. Department of Health and Human Services is authorized to cooperate with and aid state and local authorities in the enforcement of their quarantine and other health regulations and to accept state and local assistance in the enforcement of federal quarantine rules and regulations, including in the enforcement of this Order.

## Notice of Available Federal Resources

While this Order to prevent eviction is effectuated to protect the public health, the states and units of local government are reminded that the Federal Government has deployed unprecedented resources to address the pandemic, including housing assistance.

The Department of Housing and Urban Development (HUD), the Department of Agriculture, and Treasury have informed CDC that unprecedented emergency resources have been appropriated through various Federal agencies that assist renters and landlords during the pandemic, including $46.55 billion to the Treasury through the Consolidated Appropriations Act of 2021 and the American Rescue Plan (ARP). Furthermore, in 2020 44 states and 310 local jurisdictions allocated about $3.9 billion toward emergency rental assistance, largely from funds appropriated to Treasury and HUD from the Coronavirus Aid, Relief, and Economic Security (CARES).[37] These three rounds of federal appropriations also provided substantial resources for homeless services, homeowner assistance, and supplemental stimulus and unemployment benefits that low income renters used to pay rent.

Visit *https://home.treasury.gov/ policy-issues/cares/state-and-local-governments* for more information about the Coronavirus Relief Fund and *https:// home.treasury.gov/policy-issues/cares/ emergency-rental-assistance-program* for more information about the Emergency Rental Assistance Program. HUD has further informed CDC that forbearance policies for mortgages backed by the federal government are in effect until June 30, 2021, which provide many landlords, especially smaller landlords, with temporary relief as new emergency rental assistance programs are deployed.

HUD, USDA and Treasury grantees and partners play a critical role in prioritizing efforts to support this goal. As grantees decide how to deploy CDBG–CV and ESG–CV funds provided by the new funding from the CARES Act, Consolidated Appropriations Act of 2021, and ARP all communities should assess what resources have already been allocated to prevent evictions and homelessness through temporary rental assistance and homelessness prevention, particularly to the most vulnerable households.

[37] Vincent Reina *et al.*, *COVID–19 Emergency Rental Assistance: Analysis of a National Survey of Programs*, Research Brief, *https://nlihc.org/sites/ default/files/HIP_NLIHC_Furman_Brief_FINAL.pdf* (last visited Mar. 26, 2021).

HUD stands at the ready to support American communities take these steps to reduce the spread of COVID–19 and maintain economic prosperity. For program support, including technical assistance, please visit *www.hudexchange.info/program-support*. For further information on HUD resources, tools, and guidance available to respond to the COVID–19 pandemic, state and local officials are directed to visit *https://www.hud.gov/ coronavirus*. These tools include toolkits for Public Housing Authorities and Housing Choice Voucher landlords related to housing stability and eviction prevention, as well as similar guidance for owners and renters in HUD-assisted multifamily properties. Furthermore, tenants can visit *consumerfinance.gov/ housing* for up-to-date information on rent relief options, protections, and key deadlines.

## Effective Date

This Order is effective on April 1, 2021, and will remain in effect through June 30, 2021, subject to revision based on the changing public health landscape.

**Authority:** The authority for this Order is Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 CFR 70.2.

Dated: March 29, 2021.

**Sherri Berger,**
*Acting Chief of Staff, Centers for Disease Control and Prevention.*

[FR Doc. 2021–06718 Filed 3–29–21; 4:15 pm]
**BILLING CODE 4163–18–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention

### Notice of Re-Establishment of the Advisory Committee to the Director

Pursuant to Section 222 of the Public Health Service Act (42 U.S.C. 217a), as amended and the Federal Advisory Committee Act, as amended (5 U.S.C. App), the Director, Centers for Disease Control and Prevention (CDC), announces the re-establishment of the Advisory Committee to the Director, Centers for Disease Control and Prevention.

The Secretary, Department of Health and Human Services (HHS) and by delegation, the Director, CDC, are authorized under Sections 301 and 311 of the Public Health Service Act, [42 U.S.C. Sections 241 and 243], as amended to: (1) Conduct, encourage, cooperate with, and assist other appropriate public authorities, scientific